**UNITED STATES of America**
**Plaintiff,**

v.

**DEL CAMPO BAKING MFG. COM-**
**PANY, a corporation, et al.,**
**Defendants.**

**Crim. A. No. 2224.**

United States District Court,
D. Delaware.

July 21, 1972.

F. L. Peter Stone, U. S. Atty., and Richard D. Levin, Asst. U. S. Atty., Wilmington, Del., Eugene M. Pfeifer and Jay H. Geller, Attys., for the Food, Drugs, and Products Div., Dept. of Health, Education and Welfare, Rockville, Md., of counsel, for plaintiff.

H. James Conaway, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendants.

LATCHUM, District Judge.

OPINION

This case involves a criminal prosecution for violation of the Federal Food, Drug, and Cosmetic Act ("the Act"), 21 U.S.C. § 301 et seq. The ten count Information in substance charges that the defendants caused to be introduced and delivered into interstate commerce adulterated food within the meaning of 21 U.S.C. § 342(a) (3) and (4) in that the food consisted in part of whole insects and insect fragments and was prepared under insanitary conditions, in violation of 21 U.S.C. § 331(a).

The case is now before the Court for a decision on the defendants'[1] motion to suppress evidence seized by inspectors of the Food and Drug Administration ("FDA"). A suppression hearing was held on April 13, 1972. Thereafter the attorneys for the parties briefed and argued the motion which is now ripe for decision.

The relevant facts are as follows: In May, 1971, FDA Inspector Raymond Moore ("Moore") was assigned to make a routine factory inspection of the Del Campo bakery to determine whether it was in compliance with the Act.[2] On June 2, 1971 at approximately 9:20 A.M., Inspector Moore, accompanied by Inspector Linda Robinson, arrived at the bakery to carry out the inspection.[3] Upon arriving, the inspectors proceeded to the office area and introduced themselves to Robert Taylor ("Taylor"), the Del Campo Office Manager. They showed their credentials and told Taylor that "[they] were assigned to make an inspection and that [they] needed to make out [their] inspection notice to whoever was in charge."[4] Taylor informed the inspectors that Alphonso E. Del Campo ("Mr. Del Campo") was not in and that in his absence Thomas Pacchioli ("Pacchioli") was in charge of the bakery. The inspectors were then conducted into the bakery by Taylor and introduced to Pacchioli. The inspectors again showed their credentials and informed Pacchioli "that [they] were assigned to make an inspection and that [they] needed to make out [an] inspection notice to the person who was in charge."[5] Pacchioli stated that he was in charge and accepted the notice of inspection.[6] He also told the inspectors that he "had been up to his knees in flour" but to make themselves "at home", and he gave the inspectors an initial tour of the bakery,[7] acquainting them with the layout of the materials and equipment in the plant.

During the course of their inspections which took place on four separate days, June 2, 3, 4 and 7, 1971, the inspectors seized samples of various commodities and objects from the commercial premises of the two corporate defendants and purchased in Kennett Square, Pennsylvania products[8] shipped by the

1. The defendant, Alphonso E. Del Campo, initially moved, on March 28, 1972, to suppress the evidence seized from the premises of the Del Campo bakery facilities. On June 5, 1972, the corporate defendants, Del Campo Baking Mfg. Company and the Del Campo Baking Co., Inc. moved to suppress the seized evidence and in support of their motion adopted and incorporated by reference the motion to suppress previously filed by Alphonso E. Del Campo.

2. Tr. 33, 37, 38.

3. Tr. 6.

4. Tr. 12.

5. Tr. 14.

6. Id.; Def. Ex. 1.

7. Tr. 18.

8. During the course of their inspection on June 2, 1971, the inspectors spoke with route salesman Bernie Tritelli, who told the inspectors where the defendants' products were sold in Pennsylvania. (Tr. 31).

Del Campo Baking Co., Inc., the corporate defendant responsible for the distribution and sale of baked goods produced by Del Campo Baking Mfg. Company, the other corporate defendant.

The defendants contend that the evidence obtained as a result of the inspection of the facilities should be suppressed for the following reasons: (1) that Pacchioli, on defendants' behalf, had a Fourth Amendment right, of which he was unaware, to refuse entry for the purpose of inspection without a search warrant and, therefore, could not have effectively consented to the inspection or waived the constitutional rights of anyone but himself; (2) that Mr. Del Campo's later cooperation and acquiescence in the inspection did not constitute an effective consent to the search; (3) that Pacchioli had no authority as an agent to consent to the inspection of the bakery facilities; (4) that even if Pacchioli did give effective consent to the inspection of the facilities of the Del Campo Baking Mfg. Company, he could not have consented to inspection of other parts of the facilities used by the Del Campo Baking Co., Inc., the company responsible for the distribution and sales of baked goods, since he was not employed by that company; and (5) that the results of the inspection were vitiated by the lack of *Miranda* warnings because, from its inspection, the inspection and investigation had reached the accusatory stage.

At no time during the inspection was the legal authority of the inspectors questioned. Relations between the inspectors and plant personnel were at all times amicable.[9] However, the Government conceded that the inspectors neither gave anyone during the course of the inspections *Miranda* warnings nor informed anyone that there was a right to refuse the inspection without a search warrant.

While the defendants place primary reliance upon the decisions of the United States Supreme Court in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 319 (1967) for the contention that a warrantless code-enforcement inspection of a commercial premise violates the Fourth Amendment proscription against unreasonable searches and seizures unless there has been a knowing and voluntary consent, the Court holds that the legality of the seizure of evidence by the FDA inspectors is governed by the Supreme Court's more recent opinion in United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). In that case the Supreme Court held that a warrantless search of a locked storeroom during business hours, as part of the inspection procedure authorized by 18 U.S.C. § 923 (g) of the Gun Control Act of 1968 ("Gun Act") which resulted in the seizure of unlicensed firearms from a dealer federally licensed to deal in sporting weapons, was not violative of the Fourth Amendment.

In reaching that decision the Supreme Court settled much of the confusion engendered by the *Camara* and *See* cases concerning the relationship of the Fourth Amendment to regulatory inspections.

The entry into Biswell's shop was authorized by § 923(g) of the Gun Act. In addition, the Gun Act made it a crime to violate any provision of the Act. 18 U.S.C. § 924.[10] "Respondent, a pawn shop operator who was federally licensed to deal in sporting weapons," was confronted by a federal treasury agent. The agent identified himself, inspected the respondent's books, "and requested entry into a locked gun storeroom." Biswell inquired whether the agent had a search warrant, "and the investigator told him that he did not, but that § 923(g) authorized such inspections. Respondent was given a copy of the section to read and he replied, 'Well, that's what it says so I guess it's okay.'" 406 U.S. at 312,

---

9. Tr. 26.

10. The Food, Drug, and Cosmetic Act contains nearly identical provisions. See 21 U.S.C. §§ 331(f) and 333.

92 S.Ct. at 1594. Biswell then unlocked the storeroom and the inspector found and seized two sawed-off rifles which were unlicensed. "He was indicted and convicted for dealing in firearms without having paid the required special occupational tax." 406 U.S. at 312, 92 S.Ct. at 1594. The Court of Appeals reversed his conviction holding that § 923(g) was unconstitutional under the Fourth Amendment because it authorized warrantless searches of business places and that Biswell's "obstensible consent" to the search was invalid under Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).[11]

■ The Supreme Court reversed the Court of Appeals and discussed the Fourth Amendment's relation to various federal regulatory statutes. The Court noted that its decisions in Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) had failed to give much clarification to the central Fourth Amendment questions involved in carrying out regulatory inspections. In the latter case the Supreme Court merely relied upon the Government's historically broad authority to regulate the liquor industry. However, having the issue squarely before it again, the Supreme Court held that Biswell's acquiescence to the search was in no way violative of any constitutional rights he possessed. In reaching the decision the Court stated as follows:

"When the officers asked to inspect respondent's locked storeroom, they were merely asserting their statutory right, and respondent was on notice as to their identity and the legal basis for their action. Respondent's submission to *lawful* authority and his

decision to step aside and permit the inspection rather than face a criminal prosecution is analogous to a householder's acquiescence in a search pursuant to a warrant when the alternative is a possible criminal prosecution for refusing entry or a forcible entry. *In neither case does the lawfulness of the search depend on consent; in both, there is lawful authority independent of the will of the householder who might, other things being equal, prefer no search at all.* In this context, Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), is inapposite, since there the police relied on a warrant which was never shown to be valid; because their demand for entry was not pursuant to lawful authority, the acquiescence of the householder was held an involuntary consent. *In the context of a regulatory inspection system of business premises which is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute.*

\* \* \* \* \* \*

It is . . . apparent that if the law is to be properly enforced and inspection made effective, inspections without warrant must be deemed reasonable official conduct under the Fourth Amendment. . . . Here, *if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope and frequency is to be preserved, the pro-*

11. The Supreme Court in *Bumper* stated: "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. at 548–549, 88 S.Ct. at 1792.

The defendants here contend that since the *See* and *Camara* cases stand for the proposition that a regulatory inspection conducted without a search warrant is unlawful where the defendant has refused admission without such a warrant, there obviously can be no voluntarily and freely given consent to an inspection where the defendants or its agents were unaware that there was a right to request such a warrant.

*tections afforded by a warrant would be negligible."* (Emphasis added.) 405 U.S. 314, 92 S.Ct. 1595.[12]

■ The Court holds that whether Pacchioli or Mr. Del Campo were aware of the Fourth Amendment's proscription against "unreasonable search and seizures" is irrelevant. There is no issue in this case whether they knowingly and voluntarily waived their claimed right to demand the FDA inspectors to obtain a search warrant. The inspection was authorized by 21 U.S.C. § 374, and a refusal of inspection would have subjected the defendants to prosecution under the Act. See 21 U.S.C. § 331(f) and 333. The defendants could not have demanded a search warrant. The lawfulness of this search was not dependent upon any consent. Its authority was statutory.[13]

> "We have little difficulty in concluding that where, as here, regulatory inspections further urgent federal interest and the possibilities of abuse and the threat to privacy are not of impressive dimensions, the inspection may proceed without a warrant where specifically authorized by statute." United States v. Biswell, 406 U.S. 317, 92 S.Ct. 1597.

The defendants contend, however, that the *Biswell* decision is inapplicable to the present case because the Del Campo businesses are not federally licensed. In support of this contention, the defendants rely on the following statement from *Biswell*:

> "When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms and ammunition will be subject to effective inspection."

The *Biswell* decision is not to be so narrowly construed. The fact that Biswell was federally licensed to sell sporting weapons was not the rationale for upholding the warrantless inspection under the Fourth Amendment. The thrust of the opinion is that there is no issue of consent to a regulatory inspection conducted without a warrant when such a compliance inspection is authorized by federal statute in a "pervasively regulated business".

> "In the context of a regulatory inspection system of business premises which is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of

12. In reaching the above decision, however, the Court did not overrule See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 319 (1967), but rather distinguished it. The Court apparently holds that some administrative inspections are still subject to the Fourth Amendment warrant requirements if the conditions to be inspected are such that they could not be remedied in a short period of time. While this Court finds this time limitation concept somewhat nebulous, it is unimportant in the case presently under consideration. If the Food, Drug and Cosmetic Act is to be effectively enforced to protect an urgent federal interest, "unannounced" inspections are unquestionably of the utmost importance. This comports fully with the Congressional intent behind 21 U.S.C. § 374 as shown by its legislative history:

> "Those who voluntarily would permit inspections have nothing to hide and always have welcomed inspections. It is the small minority of operators—those who carry out substandard operations and the racketeer types—who

would not volunteer, because they almost invariably do have some reprehensible condition to hide. Voluntary inspection would deny inspection authority where it is most vitally needed for public protection. Dangers to life and health and such obvious frauds as palming off horsemeat for hamburger could be expected to increase in the absence of proper and enforceable inspection authority." U. S. Congressional and Administrative News, Vol. 2, p. 2200 (1953).

13. Applying the law as it existed previously to United States v. Biswell, *supra*, the Court would, nevertheless, have found the consent in this case proper to authorize the inspection. See United States v. Thriftimart, Inc., 429 F.2d 1006, (C.A. 9, 1970), cert. den. 400 U.S. 926, 91 S.Ct. 188, 27 L.Ed.2d 185 (1970), reh. den. 400 U.S. 1002, 91 S.Ct. 453, 27 L.Ed. 2d 454 (1971); United States v. Hammond Milling Co., 413 F.2d 608 (C.A. 5, 1969), cert. den. 396 U.S. 1002, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970).

a valid statute." 406 U.S. at 315, 92 S.Ct. at 1596.

■ In the instant case involving a business engaged in interstate commerce which is pervasively regulated by Congress under the authority of the Commerce Clause,[14] the inspection was conducted by FDA inspectors pursuant to statutory right. That Congress has the power to make all necessary laws for the regulation of commerce is unquestioned. "[Congress] has the right not only to pass laws which shall regulate legitimate commerce among the states and with foreign nations, but has full power to keep the channels of such commerce free from the transportation of illicit or harmful articles, to make such as are injurious to the public health outlaws of such commerce and to bar them from the facilities and privileges thereof. Congress may itself determine the means appropriate to this purpose, and so long as they do no violence to other provisions of the Constitution it is itself the judge of the means to be employed in exercising the powers conferred upon it in this respect." McDermott v. Wisconsin, 228 U.S. 115, 128, 33 S.Ct. 431, 433, 57 L.Ed. 754 (1913).

The fact that Congress has not required the Del Campo business to obtain federal licenses to operate is wholly immaterial. Defendants' business of manufacturing, processing, packing and distributing food products for introduction into interstate commerce is as "pervasively regulated" by the Federal Food, Drug and Cosmetic Act, and the regulations promulgated thereunder, as if it were federally licensed. No rational or valid distinction can be drawn for compliance inspections between a federally licensed business and one so completely regulated by the Act under the commerce power. The rationale of *Biswell* makes no such differentiation. The inspection, as conducted of the defendants' facilities, was entirely proper under *Biswell.*[15]

Accordingly, the Court concludes that there is no merit to defendants' first and second contentions.

■ The defendants' third contention that Pacchioli had no authority as agent to consent to the inspection of the bakery facilities is also without merit. The record is quite clear that Pacchioli was the "agent in charge" of the production operations of the Del Campo Baking Mfg. Company during Mr. Del Campo's absence for the purpose of being presented with the appropriate credentials and written notice of inspection under 21 U.S.C. § 374(a).[16]

Fourth, the defendants contend that, regardless of how the Court decides the consent question, Pacchioli would only have had authority to consent to an inspection of the Del Campo Baking Mfg. Company facilities, the corporate entity by whom he was employed, and not the Del Campo Baking Co., Inc., the corporate entity responsible for distributing and selling Del Campo products. Thus, defendants argue that since a separate Notice of Inspection was not issued to the Del Campo Baking Co., Inc., the inspectors had no authority to "invade the office, which is part of the sales company premises, and interrogate the office employees, who are employees of the sales company."[17] Defendants further argue that "by these tactics they acquired the essential factual information that shipments were being made *interstate* and where the non-Delaware destinations were located, and [that] they then used this information to acquire evidence of

14. Art. I, § 8 U.S. Constitution.

15. Del Campo Baking Mfg. Co. had been inspected on prior occasions by the FDA, and Pacchioli was aware of such prior inspections. (Tr. 60–61). Furthermore, the notice given at the time of the inspection clearly states the purpose of the inspection and establishes the right to inspect. In light of these facts, the defendants cannot plead ignorance of the purposes of the compliance inspection.

16. Tr. 59–61.

17. Defendants' Brief, p. 32.

interstate shipments on which each of the ten counts is based." [18]

■ The Court finds this argument untenable. It is well-settled that, in unusual circumstances, a Court may appropriately disregard a separate corporate entity in order to prevent fraud, illegality, or injustice, or when the recognition of the corporate entity would defeat public policy or shield someone from liability for a crime. Taylor v. Standard Gas Co., 306 U.S. 307, 322, 59 S.Ct. 543, 83 L.Ed. 669 (1939); Anderson v. Abbott, 321 U.S. 349, 362–363, 64 S.Ct. 531, 88 L.Ed. 793 (1944); Zubik v. Zubik, 384 F.2d 267, 272 (C.A. 3, 1967), cert. den. 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); Pauley Petroleum, Inc. v. Continental Oil Company, 239 A.2d 629, 633 (Del. Supr., 1968).

The facts of this case convince the Court that the recognition of the separate corporate entities here would work an injustice, would be detrimental to public policy, and would shield the Del Campo companies from possible criminal liability. Mr. Del Campo owned both corporations; [19] both companies were housed in the same structure; [20] there was no physically defined separation of areas between the two corporations; [21] the production equipment was interspersed with the sales and distribution equipment; [22] the office that the inspectors went to was the central office of the building, a logical place for the inspectors to first report; [23] no evidence was presented by the defendants indicating that it should have been readily apparent to the inspectors that the central office was part of the sales company premises and was staffed by employees of the sales company; and finally, neither Taylor, Pacchioli nor Mr. Del Campo, all of whom were with the inspectors at various times during the inspections, ever indicated where the two corporations began or ended.[24]

■ In light of these undisputed facts, the Court concludes that, while Inspector Moore may have had some inkling that there were two Del Campo corporations,[25] it would be manifestly unjust to hold that the FDA inspectors conducted an unauthorized inspection of Del Campo Baking Co., Inc. The defendants may not rely on separate corporate identities to frustrate the purposes of the Act where it was not apparent that such separate corporations existed.

Accordingly, it was not necessary for the inspectors to issue a second Inspection Notice. The evidence obtained after talking with an employee in the office and Tritelli will not be suppressed.

Finally, the defendants contend that no statements made by Pacchioli or by Mr. Del Campo, nor any evidence secured because of such statements, can be used against the defendants because no *Miranda* warnings were given at any time to any one.

■ The Court finds this contention unacceptable. *Miranda* warnings are only necessary where statements are "obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant

---

18. Defendants are referring to the use of the information related to the inspectors by Mr. Tritelli, a route salesman, that Del Campo products were sold at various outlets in Pennsylvania. See F.N. 8, supra. The inspectors had asked a female employee in the office about sales outside of Delaware and she referred them to Mr. Tritelli. (Tr. 31).

19. Tr. 56, 57.

20. Tr. 29, 53.

21. Tr. 28.

22. Tr. 29.

23. Tr. 11, 31.

24. Pacchioli and Mr. Del Campo each took the FDA inspectors on a tour of the premises, yet they made no mention of the fact that the building housed two corporations. (Tr. 14, 16, 21).

25. Tr. 13. While Inspector Moore may have known there were two corporations, there was no reason for him to know both were housed under the same roof or that they were so situated that it would be unlikely to be able to differentiate between them.

way." Miranda v. Arizona, 389 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). There were no custodial interrogations conducted. Neither Pacchioli nor Mr. Del Campo were at any time in custody or deprived of their freedom of action. Under such circumstances it was not necessary for the FDA inspectors to give them *Miranda* warnings. United States v. Thriftimart, supra, Footnote 6 at 1011 of 429 F.2d; United States v. Dudgeon, 279 F.Supp. 300, 302 (D.Mass., 1967).

Finding no merit to any of the defendants' contentions, the Court will deny their motion to suppress the evidence seized by the FDA inspectors.