Behjamih Altmah, J.
This motion to suppress business records is denied in all respects.
Defendant Curco Drugs, Inc. is charged in docket number K-302960 with violation of paragraph (b) of subdivision 2 of section 3324 of the Public Health Law[1]. Defendant Sam Schein *223 Mum, a principal of the corporate codefendant, is charged in docket number K-302961 with violating section 75.07 of the New York City Health Code[2].
The facts as adduced at a hearing held by this court on August 16,1973 are as follows: Salvatore Franco, senior inspector, New York City Health Department, and his partner, Warren Mansdorf, arrived at the defendant’s pharmacy located at 1715 Manhattan Avenue, Brooklyn, New York, on September 26,1972. They exhibited their shields and announced to defendant Scheinblum, a pharmacist for over 30 years and a principal in the business, that they were there to perform a routine audit. Mr. Franco had never been there before but it appears his partner, Mr. Mansdorf, had visited the pharmacy some three weeks earlier.
Testimony reveals the two inspectors worked on the premises part time for six days during the period September 26 to October 4, 1972. During this time, the inspectors talked with both the defendant Scheinblum and Jack Homnick, the president of the corporation, and were provided, as requested, with records of five drugs, of which four were prescription and one nonprescription.
As a result of the audit and observations made therein, the inspectors indicated to both principals at various times during the audit that they appeared to be violating the Public Health Law and the New York City Health Code, particularly subdivision 2 of section 3324 (par. [b]) and subdivision (c) of section 75.07, respectively. Apparently, the pharmacy had a violation in regard to section 75.07, dating some six months prior, and had not corrected its practices.
*224 As a result of the audit, Inspector Franco noted that sales of the nonprescription over-the-counter drugs amounted to 4,000 sales during a certain period, whereas, based on his experience as an auditor and his 25 years as a pharmacist, normal sales for a pharmacy of that size for a like period should have been less than 400.
When he mentioned the excessive sales of over-the-counter drugs to Mr. Homnick, some time during the audit period, Franco testified Mr. Homnick indicated he was selling the drug through schools and “ He simply said if I didn’t sell it, someone else is going to sell it.”
The inspectors left the store on October 4 and as a result of discussions with their supervisors, who are responsible for determining the institution of criminal prosecutions, Mr. Homnick was invited to an informal hearing at the Health Department’s offices on October 27. He was advised that he could he represented by counsel at such hearing.
There is no record of the October 27 hearing; however, apparently as a result of what transpired, it was decided to pursue the investigation. On December 4 the inspectors returned to the store, requested nonprescription records, issued a receipt and departed, without serious protest by the principals.
Inspector Franco testified that Mr. Homnick freely consented to turning over the records. According to Franco, the reason the hooks were taken from the store was that a complete audit of each of 4,000 over-the-counter sales of “ Robitussin ” would have taken a week to 10 days to compile and could he more conveniently carried out at the Health Department’s office. Inspector Franco further stated that he could not have taken the books without the owner’s consent because he did not know where they were and, if he had been refused access to the books, he would not have taken them. Bather, he would have gone hack to his office and told his superiors and probably would have reported the defendants to the State Board of Pharmacy.
Mr. Homnick’s testimony on this point was as follows:
“ Q. Did he ask you for your consent!
“ A. Never did.
“ Q. Did you give your consent?
“ A. It wouldn’t he to my advantage not to give him my consent. Why should I cover up? I felt we did nothing wrong. He didn’t specify the reason why he wanted the hooks.
“ Q. Did you sign the receipt?
" A. Yes,
*225 “ Q. Did you voice a protest?
“A. I didn’t — I had no idea what they wanted, but they are from the Board of Health, they are inspectors, I have no influence over them.” '
On December 21, the defendants received a summons in the mail charging them with the violations that are the subject of this hearing.
It is conceded that the inspectors of the Health Department are peace, officers pursuant to section 3390 of the Public Health Law.[3] It is also conceded that at no time during the period September 27, 1972 to December 21, 1972 did the inspectors give the principals Miranda warnings (Miranda v. Arizona, 384 U. S. 436) nor did they obtain a search warrant.
Defense counsel, on papers, now moves to suppress on the basis that section 339.0 of the Public Health Law is unconstitutional in that it violates defendant’s Fourth Amendment right to privacy. He argues that the inspections authorized by the statute are arbitrary, the procedures are not specifically delineated, and the statute is too overbroad and general in giving the State the authority at any time and without reason to inspect the defendant’s records.
Additionally, on the hearing, defense counsel argued, in moving to suppress, that the records were seized as a result of an illegal and warrantless search and seizure, and also on the basis of lack of the Miranda warnings.
This suppression motion presents issues on which there is a significant conflict of authority. I find that the defendants were the subject of a criminal investigation by a peace officer certainly after the October 27 meeting and probably after the discovery of the irregularities in the sale of drugs by the preliminary audit. I also find that in the five weeks from October 27 to the seizure of the books on December 4, the officers had ample opportunity to apply for a search warrant for the seized *226 documents. The question remains, however, (1) was there consent to search without a warrant and (2) whether, absent effective legal consent, the officers’ statutory right to inspect the records of the pharmacy gave them the right to seize the records without a warrant, and (3) is there a necessity for Miranda warnings ?
(1) CONSENT
It is a well-established rule of law that a police officer need not obtain a warrant to make a search where the person searched gives his voluntary consent (Frasier v. Cupp, 394 U. S. 731; People v. Overton, 20 N Y 2d 360, reaffd. on rehearing 24 N Y 2d 522; Matter of McKaba v. Board of Regents of Univ. of State of N. Y., 30 A D 2d 495). Such consent, however, must be unambiguous, for courts are reluctant to find a waiver of constitutional rights where it is unclear that an intent to waive those rights existed (Johnson v. Zerbst, 304 U. S. 458). With respect to consent in the absence of a warrant, the Supreme Court has said in Bumper v. North Carolina, 391 U. S. 543, 548-549: “When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescense to a claim of lawful authority.” (See, also, People v. Whitehurst, 25 N Y 2d 389; People v. Lakin, 21 A D 2d 902; People v. Laverne, 14 N Y 2d 304.)
Thus in Bumper, the court held the consent given by a 66-year-old woman to a police search of her house after the police officers informed her they had a search warrant, which later was found to be invalid or nonexistent, was not sufficient to waive the constitutional right and to grant suppression at trial of evidence so obtained.
Where the person searched made no specific objection to a search by an inspector of a regulatory agency, other courts have not hesitated to find consent to a waiver of Fourth Amendment rights and have refused to suppress evidence thus obtained. (United States v. Thriftmart, Inc., 429 F. 2d 1006, cert. den. 400 U. S. 926, rehearing den. 400 U. S. 1002; United States v. Hammond Milling Co., 413 F. 2d 608, cert. den. 396 U. S. 1002; United States v. Del Campo Baking Mfg. Co., 345 F. Supp. 1371; Matter of McKaba v. Board of Regents of Univ. of State of N. Y., 30 A D 2d 495, 497-498, supra.) Nevertheless, I .agree with the defendant that a voluntary consent to waive the constitutional right to demand that a search be made only with a warrant did not exist here. Though the evidence is somewhat conflicting on *227 this point, it appears that the defendant allowed the inspector to search and seize his records without a warrant because he thought he was required to do so by law. Where the owner permitted an inspector of an administrative agency to search business premises, many of the above-cited cases finding consent are distinguishable on the ground that, in those unlike the situation here, the inspector making the search did not suspect prior to that time that there was a violation of law. Here, Inspector Franco, when he seized the books on December 4, knew that the records indicated possible criminal violations. Additionally, although there is no indication in the record that he actually formally objected, the defendant, according to his testimony, did not immediately co-operate with the inspector but was somewhat suspicious of the request.
What we have here was in the words of Bumper, “ acquiescence to a claim of lawful authority ” to seize the books and not a knowing and voluntary waiver of constitutional rights. I find therefore, that if the search is to be held constitutional it must be on the grounds that the officers had a lawful right to search without a warrant.
(2) THE OFFICERS ’ RIGHT TO SEARCH WITHOUT A WARRANT
Section 3390 of the Public Health Law states that officers of the Department of Health “ shall have access at all times to all orders, prescriptions or records to be kept under this article.” Since the records here in question were clearly covered by subdivision 3 of section 3333 of the Public Health Law, there is no question that the officers had a statutory right to inspect the records. I further find on the basis of the testimony that the taking of the records from the pharmacy was solely for the purpose of facilitating the audit of the defendant’s books and thus was within the scope of the officer’s statutory duties under these sections.
The fact that the statute authorizes such seizures, does not necessarily mean that administrative inspections can be performed in the absence of a warrant without running afoul of the Fourth Amendment. In See v. City of Seattle (387 U. S. 541) and Camara v. Municipal Ct. (387 U. S. 523), the United States Supreme Court overruled its previous holding in Frank v. Maryland (359 U. S. 360) that searches carried out without a warrant pursuant to a statute providing for blanket inspections by municipal authorities were constitutional. It found statutes authorizing broad inspections without a warrant, of commercial premises to detect violations of municipal fire code *228 (¿See) or of a person’s home by municipal health inspectors (Camara), were unconstitutional invasions of the Fourth Amendment right of privacy against unreasonable searches and seizures. The court in See .stated (pp. 545-546), however: “ We do not in any way imply that business premises may not reasonably be inspected in many more situations than private homes, nor do we question such accepted regulatory techniques as licensing programs which require inspections prior to operating a business or marketing a product.”
The Supreme Court in Colonnade Corp. v. United States (397 U. S. 72) elaborated on the dictum that warrantless inspections would be permissible where they were made pursuant to accepted regulatory techniques. There the court said that subdivision (b) of section 5146 of title 26 of the United States Code, permitting the inspection of retail liquor dealers by treasury agents without a warrant, was constitutional. But, it held that since the statute did not allow the agents to break into a locked storeroom, where permission to enter was refused by the owner, a conviction founded on the seizure of incriminating evidence without a warrant over the owner’s active and vociferous protest was unconstitutional. The court pointed out that the statute provided a separate penalty for refusing to allow the agents to make a warrantless search and the owner had elected to submit himself to that penalty rather than the search.
In terms of the issue for decision here the most recent arid relevant United States Supreme Court case relating to regulatory inspections without warrants is United States v. Biswell (406 U. S. 311). The court there upheld the constitutionality of the warrantless seizure of unlicensed firearms from a licensed firearms’ dealer, where the arms were discovered in the course of a periodic inspection of the premises made pursuant to subdivision g of section 923 of the Gun Control Act of 1968. The court said that the Bumper rationale requiring consent of the owner to the search was irrelevant where the search was made pursuant to a valid regulatory statute. It stated (United States v. Biswell, supra, p. 315): “In the contest of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends nqt on consent but on the authority of a valid statute.”
The court emphasized that the importance of the Federal regulatory scheme in controlling firearms outweighed the interests of the individual firearms’ dealer in asserting the protection of the Fourth Amendment against searches and seizures without a warrant. It further implied the dealer, by agreeing *229 to become licensed, waived his Fourth Amendment right of privacy. It said (p. 316): “When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection.”
The People here argue that this case falls squarely within the principle enunciated in Biswell that a warrant need not be obtained where a search and seizure is made pursuant to a valid regulatory statute. In part, I agree with this contention. Certainly the State’s interest in regulating the sale of drugs and preventing the illicit sale of narcotics is every bit as weighty as the Federal interest in regulating the sale of guns. I also agree with the People that the two reported New York cases dealing with the statutory authority here claimed provide strong support for this position.
In McKaba v. Board of Regents of Univ. of State of N. Y. (30 A D 2d 495, supra), the Appellate Division, Third Department, upheld the constitutionality of an inspection of a pharmacist’s records by the Health Department pursuant to section 3390 against a challenge based on the Fourth Amendment. It stated (p. 498): “ In accepting his license the petitioner accepted the incident obligation of keeping the required records and permitting their inspection. The dangers and hazards of narcotics to health and public safety are known to all. Such records are nonprivileged records required by statute to be kept for proper regulation and protection of the general public and their inspection without a search warrant was constitutionally valid. (People v. Laverne, 14 N Y 2d 304.)”
While it is true that McKaba dealt with a civil proceeding to suspend a license to operate a pharmacy and not a criminal action similar to the one we have here, I believe that this distinction has no constitutional significance. The search sustained in Biswell was used as the foundation of a criminal indictment. Similarly in People v. Terraciano (39 A D 2d 1005), a criminal conviction based on evidence seized by a narcotics investigator pursuant to a warrantless search under section 3390 of the Public Health Law was sustained against a Fourth Amendment challenge. The court there relied on the authority of the Bis-well and McKaba cases. While the Terraciano case is distinguishable from the case at bar on the grounds that there, unlike here, Miranda warnings were clearly given prior to the search, I do not, in view of my disposition of the Miranda issue, view this as of controlling significance.
*230 Of much greater concern is the lack of initiative in obtaining a search warrant in the five-week interim just prior to the December 4 seizure in light of the apparent decision to pursue the investigation and perhaps prosecute. Unlike the situation in some other cases dealing with a seizure of evidence made after a regulatory inspection, including Biswell, the evidence here was not seized until after the preliminary inspection had disclosed possible violations of criminal law. The defendant was clearly suspected of possible criminal activity and the officers undoubtedly knew the material seized would be used at trial. Furthermore, the objects of the seizure, the defendant’s records, may not have been as likely to disappear as an illegally held gun. The question thus arises whether the Biswell holding that a regulatory search may be constitutionally made without a warrant applies where the officer making the inspection has ample opportunity to obtain a warrant.
The only reported authority that deals with this problem directly is United States v. Anile (352 F. Supp. 14), a case similar to this in which the records of a pharmacy were seized by Federal agents without a warrant acting under an analogous Federal statute. There, as here, the agents failed to give the defendant Miranda warnings. The seizure of the records apparently occurred after there had been several previous visits to the pharmacy and the court found that the purpose of the agent’s visit to the pharmacy was to inspect his records in contemplation of a criminal prosecution. The court there granted the defendant’s motion to suppress. It distinguished the Biswell case by looking to the report of the overruled Court of Appeals decision in Biswell to find that the search in Biswell was a routine inspection. The court thus, in finding a warrant necessary, stated (United States v. Anile, 352 F. Supp. 14, 17, supra): “ It is readily apparent that there are many similarities between Biswell and the present case. This case is unlike Bis-well, however, in that the inspection of this defendant’s records was not the result of a decision to conduct a routine, periodic inspection. The search in Biswell was a routine one. Biswell v. United States, 442 F. 2d 1189, 1190 (10th Cir. 1971)”.
On the other hand the two relevant cases in this jurisdiction, McKaba and Terraciano both imply, though the exact circumstances of the challenged searches are not clear from the report, that by accepting his license, the pharmacist agrees to abide by State statutes allowing for inspections of his books by health inspectors at any time. Thus he foreswears the protection of the Fourth Amendment.
*231 Given this conflict of authority, I treat this issue as one of first impression. The importance of the defendant’s interest in obtaining the protection of the Fourth Amendment must be balanced against the public interest of the Health Department in making an inspection without a warrant. As I read the Biswell case, there is no evidence that in making its decision, the Supreme Court relied on the fact that the inspection was routine. The court, in Biswell, discussed the importance of frequent unannounced inspections as a credible deterrant to violations of the act. However, here the officers knew about the violations and the obtaining of a warrant would not have seriously undermined the act’s purpose of deterring violations. Clearly, it would have been only a minimal interference with their duties to obtain a warrant. On the other hand, I find that the defendant’s interest in asserting the Fourth Amendment right is similarly weak. The defendant clearly knew his books which, by statute he is required to maintain, would be subject to inspection by the Health Department at any time. On balancing these interests, I find, despite the minimal inconvenience involved, it would be a meaningless formality to require the Health Department inspectors to obtain a warrant to inspect records which, by statute, they have a legal right to search anyhow.
The defendant, in his brief, seeks to distinguish the Biswell case on still another ground. He points out that the statute under which the search in Biswell was made (Gun Control Act of 1968, U. S. Code, tit. 18, § 923, subd. [g]) limits the time and place of the search to “business hours ” on the dealer’s premises. It is true the court in Biswell did at one point seem to condition its holding that consent to search without a warrant was unnecessary in regulatory inspections on the requirement that the regulatory inspection system is “ carefully limited as to place, time and scope”. Although section 3390 of the Public Health Law is not on its face as limited as subdivision (g) of section 923 of the Gun Control Act in that it allows access to the records required “ at all times ” and not just during business hours, it is undisputed that the search here took place during business hours and was not unreasonable in respect to the scope of the items searched. Since it is the policy of the Health Department to perform inspections only during business hours, in order to sustain the defendant’s contentions we would have to find the statute unconstitutional on its face.
Though we recognize there is a recent decision of a Federal District Court in the Western District of New York emanating *232 from the Terraciano case which apparently does just that (Terraciano v. Montanye, 360 F. Supp. 1377), I refuse to follow that course here. Certainly the Appellate Division of the Third Department in People v. Terraciano (39 A D 2d 1005, supra) passed on this argument and rejected it.
Were this a case where the search was carried out other than during business hours or in a manner that was clearly unreasonable, the defendant’s argument would have considerable force. While I agree that it is unfortunate that the Legislature, in its wisdom, has not seen fit to redraft section 3390 of the Public Health Law in a manner that would more clearly comport with the constitutional requirements of Biswell by more strictly limiting the time of permissible inspections, I believe there is no question the statute, as it has been applied in this case and as it is applied in daily practice by the Department of Health, fully complies with the standards enunciated in Biswell. I am, therefore, extremely reluctant to find that the statute is unconstitutional, because on its face, it might authorize an unconstitutional search in some future hypothetical case. This is especially-significant where the statute has been in force without constitutional challenge for many years, and is of considerable value in the enforcement of the State’s interest in regulating the sale and distribution of dangerous drugs today. The court cannot blind itself to the widespread distribution of narcotic drugs outside of lawful channels which has wrought such inhuman tragedy on our population. The recent session of the Legislature indicated its concern over this problem by enacting a major recodification and tightening of article 33 of the Public Health Law and the provisions of the Penal Law dealing with drug offenses.
This latter comment applies with equal force to the final argument raised in defendant’s written brief — that -section 3390 of the Public Health Law is an unconstitutional invasion of the pharmacist’s right to privacy. While it is true that the Second Circuit Court of Appeals (per Friendly, J.) has recently questioned the constitutionality of some sections of the newly enacted statute in the case of Roe v. Ingraham (480 F. 2d 102), the challenge there was on the basis of the right of privacy of the pharmacist’s customers against the disclosure to State ■authorities of their purchases of drugs. There was never in that case any question about the State’s right to invade the privacy of the pharmacist by submitting him to stringent regulation of his business. For this reason, the other right to privacy cases cited in defendant’s brief are similarly inapplicable.
*233 (3) MIRANDA WARNINGS
The defendant asserted in court, but has apparently abandoned in his written brief, the claim that the search was here invalid because no warnings were given to the defendants that they were the target of a criminal investigation.
In Miranda v. Arizona (384 U. S. 436, supra), the Supreme Court held that warnings of certain constitutional rights must be given to a defendant who is in police custody prior to any questioning of him. This decision was later extended by the Court in Orosco v. Texas (394 U. S. 324) to interrogations that take place outside of the police station when the person questioned was " deprived of his freedom of action in a significant way” (Orozco v. Texas, supra, p. 327). There has since been considerable controversy and conflict of authority as to whether Miranda warnings must be given in noncustodial situations where the suspect questioned is the target of a criminal investigation.
In United States v. Dickerson (413 F. 2d 1111), the leading case arguing for the necessity of Miranda warnings beyond the clearly custodial situations of the Miranda and Orosco cases, the court held that warnings must be given to a taxpayer in an Internal Revenue Service interview whenever the taxpayer becomes the target of a criminal investigation whether or not he is in custody. The court there reasoned that the Miranda ■doctrine required (p. 1114): “that one confronted with governmental authority in an adversary situation should be accorded the opportunity to make an intelligent decision as to the assertion or relinquishment of those constitutional rights # * Custodial interrogation is merely one variety of confrontation, albeit one requiring the most stringent of protections for the criminal suspect. ’ ’
Even though this argument has apparently been rejected by the courts of this and most other circuits (United States v. Squeri, 398 F. 2d 785), we have considerable sympathy for it under the facts of this case. If the question here were the admissibility of the defendant’s statements to the officers about the sales of drugs, it might apply. The issue here is not the admissibility of statements but the admissibility of evidence allegedly seized in violation of the Fourth Amendment.
Even the Seventh Circuit, originator of the Dickerson rule, has been reluctant to find that Miranda warnings are ‘ ‘ a sine qua non to a valid consensual search.” (United States v. Sicilia, 475 F. 2d 308, 311; United States v. Young, 471 F. 2d 109.) While I recognize that there is some authority to the *234 contrary, I believe that the prevailing rule in this and most jurisdictions is no Miranda warnings need be given even where there is an issue of the validity of the consent to search. (United States ex rel. Combs v. La Vallee, 417 F. 2d 523; United States v. Sheard, 473 F. 2d 139; Gorman v. United States, 380 F. 2d 158.) This conclusion applies with even greater force here where the right to search is dependent not on consent, but on the authority of a valid statute. (United States v. Del Campo Baiting Mfg. Co., 345 F. Supp. 1371.)
Defendant’s motion tó suppress is hereby denied in all respects.-

. “ § 33.24. Preparations excepted from prescription or order.
“1. The following preparations may he sold at retail by pharmacists and dispensed by hospitals, nursing homes and dispensaries without a physician’s prescription or written order, in quantities of not more than four fluid ounces to any one person on any one day:
“(a) Stokes’ expectorant.
“(b) Brown mixture.
“(e) Any medicinal preparation that contains in one fluid ounce (or in one avoirdupois ounce, when sold in solid or semi-solid form) not more than one grain of codeine or any of its salts.
“(d) Any medicinal preparation that contains in one fluid ounce not more than one-quarter of a grain of ethylmorphine or any of its salts. *223 “(e) Any medicinal preparation that contains in one fluid or avoirdupois ounce not more than two grains of noseapine (formerly narcotine) or any of its salts.
“(f) Any medicinal preparation that contains in one fluid or avoirdupois ounce not more than two grains of papaverine or any of its salts.
“ 2. The exception authorized by this section shall be subject to the following conditions:
“(a) that the medicinal preparation administered, dispensed, or sold, shall contain, in addition to the narcotic drug in it, some drug or drugs conferring upon it medicinal qualities other than those possessed by the narcotic drug alone;
“ (b) that such preparation shall be administered, dispensed, or sold in good faith as a medicine, and not for the purposes of evading the provisions of this article ”.

. Section 75.07 of the New York City Health Code (drugs dispensed on prescription) provides: “(c) A pharmacist shall file each prescription when filled and make it available for inspection by the Department for at least two years.”

. Section 3390 o£ the Public Health Law (Enforcement) provides:
“ 1. It is hereby made the duty of the department, its officers, agents, inspectors and representatives, and of all peace officers within the state, and of the judicial and police authorities of the state and of the political subdivisions thereof to enforce all provisions of this article, except those specifically delegated, and to cooperate with all agencies charged with the enforcement of the laws of the United States, of this state, and of all other states relating to depressant or stimulant drugs.
“2. Such authorities and their agents shall have access at all times to all orders, prescriptions or records to he kept under this article.
“3. For the purposes of this article, each representative of the commissioner shall possess all of the powers of a peace officer.” (Added by L. 1965, eh. 323, § 1, eft Jan. 1,1966.)