UNITED STATES of America, Plaintiff-Appellee,

v.

Michael NECHY, Defendant-Appellant.

No. 86–2814.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1987.
Decided Aug. 27, 1987.

Marna M. Tess-Mattner, Gimbel, Reilly, Guerin & Brown, Milwaukee, Wis., for defendant-appellant.

Patricia J. Gorence, Asst. U.S. Atty., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before POSNER and FLAUM, Circuit Judges, and WILL, Senior District Judge.*

POSNER, Circuit Judge.

In 1980 the Drug Enforcement Administration learned that the Mid-Towne Pharmacy in Milwaukee was ordering immense quantities of "controlled substances," including Talwin, an analgesic frequently used as a substitute for heroin and, when so used, illegal. The pharmacy was owned by David Wolkenstein and registered with the DEA, and Title 21 of the United States Code required the pharmacy to maintain complete and accurate records of the purchase and disposition of controlled substances. The pharmacist was Michael Nechy, who is the defendant and appellant in this case.

The DEA's Chicago office contains a small staff (8) of "compliance investigators" who in 1980 were responsible for civil enforcement of Title 21 in Illinois and Wisconsin. On October 1 of that year one of these investigators, Wyler, obtained from a federal magistrate a warrant authorizing an inspection of the Mid-Towne Pharmacy and the seizure of records found there; earlier Wyler had participated with a Milwaukee narcotics detective, Randa, in a criminal investigation of the pharmacy, and had recommended prosecution. The warrant was issued under 21 U.S.C. § 880, on the basis of an affidavit by Wyler which stated that the pharmacy was registered with the DEA, had never been inspected, and was buying Talwin in suspiciously large quantities.

Section 880 authorizes entry into premises where controlled substances or records thereof are kept (§ 880(a)), "for the purpose of inspecting, copying, and verifying the correctness of records, reports, or other documents required to be kept or made under this subchapter [effectively, under Title 21] and otherwise facilitating the carrying out of [the Attorney General's] functions under this subchapter." § 880(b)(1). "Such entries and inspections shall be carried out through officers or employees (hereinafter referred to as 'inspectors') designated by the Attorney General." § 880(b)(2). In certain cases the inspectors are required, and in others they are authorized, to proceed by warrant. See § 880(c), (d). The warrant can authorize not only inspections but also "seizures of property appropriate to such inspections." § 880(d)(1). Although a judge or magistrate asked to issue a warrant under section 880 may do so only upon a showing of "probable cause," the statute defines this term to mean "a valid public interest in the effective enforcement of this subchapter or regulations thereof sufficient to justify ad-

---

* Hon. Hubert L. Will of the Northern District of Illinois, sitting by designation.

ministrative inspections of the area, premises, building, or conveyance, or contents thereof, in the circumstances specified in the application for the warrant." § 880(d)(1). The statute does not require probable cause to believe that the search will turn up evidence of a criminal violation.

Wyler and another compliance investigator went to the Mid-Towne Pharmacy on October 2 to execute the warrant. They were accompanied by Randa and three other Milwaukee narcotics detectives, two of whom, however, left shortly after the search began. Wyler had told the detectives they would be accompanying him and the other federal agents only to provide protection. Compliance investigators are unarmed, and not only was the pharmacy in a tough neighborhood but Nechy was known to keep a gun for self-protection; moreover, Wyler suspected criminal violations of the drug laws.

The investigators searched the files, and removed from them prescriptions, receipts, and other documents relating to Talwin and another controlled substance. The detectives helped out by counting the prescriptions and bundling them into packages of 100 each. At one point a uniformed police officer entered and took photographs, ostensibly to make sure the search wasn't doing damage to the store. The search resumed the next day. Four federal compliance investigators conducted it. At one point during this search Nechy carried a box of Talwins from the basement (which was not searched) and handed it to the investigators.

Nechy moved the district court in which the warrant had been issued to suppress the seized items as evidence of crime and return them to him. See Fed.R.Crim.P. 41(e). He claimed that the administrative search had been merely a subterfuge for obtaining evidence of criminal guilt. He asked for an evidentiary hearing to explore this claim but the district court refused, and we affirmed. *In re Searches & Seizures Conducted on October 2, and 3, 1980*, 665 F.2d 775 (7th Cir.1981). We thought "that any underlying auxiliary motivation for the search was irrelevant," *id.* at 776–77, provided the search had been upon probable cause as defined in the statute, which we held it had been.

Nechy was indicted for violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, a controlled substance), for conspiracy to violate this provision (a charge that was, however, dismissed), and for aiding and abetting such violation. After his motion to suppress the evidence obtained in the search was denied, he submitted a conditional plea of guilty. The judge accepted the plea and sentenced Nechy to serve five years in prison, to pay a fine of $25,000, and to be placed on special parole for three years after his release from prison. The condition in the plea was that he be allowed to appeal from the denial of the motion to suppress, and to raise certain other objections to his conviction. Wolkenstein was convicted in a separate proceeding, and closed the pharmacy.

■ The principal issue on this appeal—the lawfulness of the search—was resolved against Nechy on his previous appeal; and since the doctrine of law of the case applies in criminal as in civil cases, see, e.g., *United States v. McMahon*, 715 F.2d 498 (11th Cir.1983) (per curiam); *United States v. Kincaid*, 712 F.2d 1, 4 (1st Cir.1983), we are perplexed as to why Nechy wanted to condition his plea of guilty on his being permitted to appeal again from the denial of the motion to suppress—and equally as to why the government does not invoke the doctrine of law of the case to block the appeal at the threshold. But as the government does not even mention the doctrine, we shall consider the merits of Nechy's argument, though with due regard for the significance of our previous opinion as a precedent that we are bound to follow unless a powerful reason is given for not doing so. We add that the Sixth Circuit has reached the same conclusion as we had in that opinion. See *United States v. Acklen*, 690 F.2d 70 (6th Cir.1982). We know of no contrary precedents.

■ There is another threshold question, concerning Fourth Amendment "standing." The issue of Fourth Amendment standing is not usually, or in this case, jurisdictional; and, whether through

inadvertence or as a matter of tactics, the government has waived the issue by failing, at any point in these proceedings, including briefing and argument in this court, to question standing. See *United States v. Bentley*, 825 F.2d 1104, 1109 (7th Cir. 1987). Of course, if the search had not led to Nechy's conviction, we would have no jurisdiction to consider the question of its legality; that would be an academic question, which Article III of the Constitution does not authorize us to answer even if the parties want us to. But since the search did lead to his conviction, Nechy was hurt, so Article III was satisfied. The fact that the records and drugs found in the search were not Nechy's might, if the government had raised the point, lead us to conclude that his rights had not been violated. Or might not; the test is not ownership but "reasonable expectation of privacy," a multi-factored test of inherently uncertain application. See, e.g., *United States v. Peters*, 791 F.2d 1270, 1281 (7th Cir.1986). We express no view on how Nechy's Fourth Amendment standing would fare under such a test, but merely emphasize that, even if he flunked it, that would not deprive us of jurisdiction. It would merely make this a case of *damnum absque injuria* (harm without a wrong). The issue of rights has to do with the scope of the Fourth Amendment rather than the existence of federal subject-matter jurisdiction, which depends on the *damnum*, not the *injuria*. See *Steagald v. United States*, 451 U.S. 204, 208–11, 101 S.Ct. 1642, 1646–47, 68 L.Ed.2d 38 (1981); *Rakas v. Illinois*, 439 U.S. 128, 138–40, 99 S.Ct. 421, 427–29, 58 L.Ed.2d 387 (1978); *United States v. Peters, supra*, 791 F.2d at 1280–81.

■ Nechy makes two main arguments against the legality of the search. The first is that a search under 21 U.S.C. § 880 is improper where, as he contends is the case here, the only purpose is to obtain evidence of a criminal violation. The Fourth Amendment forbids unreasonable searches, and also forbids searches based on warrants not supported by probable cause. In his affidavit to the magistrate who issued the warrant, Wyler did not try to establish probable cause to believe that a search of the Mid-Towne Pharmacy would yield evidence of a crime. However, under 21 U.S.C. § 880, read literally, all he had to show to get the warrant was that the pharmacy was handling a controlled substance. He showed that and more—that it was buying suspicious quantities, and hadn't been inspected before—and as we held in our first opinion, see 665 F.2d at 777, either showing would have been enough to establish statutory "probable cause" for the warrant. See also *United States v. Acklen, supra*, 690 F.2d at 73; *United States v. Voorhies*, 663 F.2d 30, 33 (6th Cir.1981); *United States v. Prendergast*, 585 F.2d 69, 70 (3d Cir.1978); *United States v. Schiffman*, 572 F.2d 1137, 1140–41 (5th Cir.1978); cf. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320–21, 98 S.Ct. 1816, 1824–25, 56 L.Ed.2d 305 (1978). But Wyler did not attempt to demonstrate, and the magistrate did not find, that the warrant was justified by probable cause to believe that its execution would lead to evidence of a criminal violation.

■ The fact that the government obtained access to Mid-Towne Pharmacy without satisfying the requirements of the Fourth Amendment for criminal investigatory searches on warrant is immaterial, however, if it was lawful access; for once properly engaged in searching the pharmacy's files the government could seize any evidence of crime that it saw. See, e.g., *New York v. Burger*, —— U.S. ——, 107 S.Ct. 2636, 2651, 96 L.Ed.2d 601 (1987) ("The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect"); *United States v. Cerri*, 753 F.2d 61, 64 (7th Cir.1985). And it saw plenty. True, the incriminating nature of the records was not evident until, having been seized and bundled and taken back to DEA headquarters, they were read there. But the warrant did not authorize merely an inspection of the records on the premises of the pharmacy; it authorized their seizure and removal. So they were lawfully in the government's custody when they were read and their incriminating nature was re-

vealed. Anyway Nechy makes no issue of plain view.

■ The government's access to the pharmacy's records was lawful, however, only if the warrant was proper; and the warrant was proper only if it was pursuant to one of the purposes listed in section 880. But those purposes are comprehensive; one is simply to inspect records of controlled substances. That was certainly the immediate purpose of the warrant although the ulterior purpose ("underlying auxiliary motivation," we called it oxymoronically in our first opinion) was to obtain evidence of a criminal violation.

We are not happy with a mode of justification by which the government is allowed to do in two steps what if done in one would violate the Fourth Amendment. The government cannot enter a store and search its records merely on suspicion of a violation of the criminal laws; there must be probable cause. But having subjected pharmacists to an elaborate regulatory system that includes a requirement of keeping records, the government claims the right to seize those records without satisfying the requirements for a criminal search; and once having gained lawful access to the records on whatever basis, the government can use the "plain view" rule to retain any incriminating records for use as evidence in a criminal prosecution.

Nevertheless we can see no escape from the conclusion that this two-step process is lawful. This is true even though section 880 undoubtedly exists primarily if not exclusively to facilitate criminal investigations, and even though, in practice, the DEA concentrates its severely limited civil investigative resources against "suspected ... violators" and "'high risk' registrants," defined as firms likely to divert controlled substances into illegal channels of distribution. Ann.Rep.U.S.Atty. Gen'l 1980, at 54. "Only on an investigation of some suspected or reported impropriety is the record-keeping scrutinized." Vilensky, *The Diversion of Legal Drugs—The Key Factors*, 11 Registrant Facts, no. 1, at 1, 4 (U.S.Dept. of Justice, DEA 1986).

Nechy does not argue that the provisions of Title 21 which require the maintenance of complete and accurate records pertaining to the purchase and sale of controlled substances (see 21 U.S.C. § 827) are unconstitutional, or that a system of administrative warrants is an unconstitutional method of policing compliance with the requirements. The Fifth Circuit, in *United States v. Schiffman, supra*, 572 F.2d at 1140–41, upheld the constitutionality of the system in a well-reasoned opinion. The Supreme Court has repeatedly upheld similar systems of regulation even though they authorized inspections without a warrant—provided that, as here, the businesses were heavily regulated to begin with. See, e.g., *New York v. Burger, supra*, 107 S.Ct. at 2649–52 (automobile junkyards); *United States v. Biswell*, 406 U.S. 311, 315, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972) (firearm dealers). It is true that, realistically speaking, statutes such as section 880 require, not probable cause in any meaningful sense, but just a showing that the search would be reasonable. See *Griffin v. Wisconsin*, —— U.S. ——, 107 S.Ct. 3164, 3170 n. 4, 97 L.Ed.2d 709 (1987). So construed, however, such statutes are constitutional, as we may infer from a remark by the Supreme Court on the "probable cause" required for a search of business premises by OSHA under 29 U.S.C. § 657(a): "Probable cause in the criminal law sense is not required." *Marshall v. Barlow's, Inc., supra*, 436 U.S. at 320, 98 S.Ct. at 1824. Anyway Nechy does not argue that section 880 is unconstitutional.

■ He does argue, however, that Wyler's undoubted motive of gathering evidence for a criminal prosecution tainted the search. We rejected that argument in our first Nechy opinion, and similar arguments have been rejected in other cases, such as *United States v. Acklen*, cited earlier, and *United States v. Gel Spice Co.*, 773 F.2d 427, 432 (2d Cir.1985). Such motives will always be present, so the argument is a disguised attack on the constitutionality of section 880—whose constitutionality Nechy concedes. The only purpose of requiring pharmacies to maintain complete and accurate records of transactions in controlled substances is (so far as we are able to determine) to deter, by facilitating investi-

gation of, criminal violations of the federal drug laws. Therefore the principal violators of the record-keeping requirements in whom the DEA is interested are bound to be pharmacies engaged in illegal drug trafficking. In any event, since the DEA lacks the staff to inspect all or even most pharmacies, it must focus its attention on those believed to be engaged in such trafficking, for they are the ones most likely not to be keeping complete and accurate records. But this means that it will always be suspicious that the pharmacy it is inspecting is not just failing to keep complete and accurate records but is engaged in the illegal traffic in drugs.

So compelling is this allocation of investigative resources that the cases cited earlier that find probable cause for issuance of a warrant under section 880 emphasize facts, such as the quantity of drugs purchased, that are clues to possible criminal violations, rather than treat the presence of such facts as a circumstance tainting the search. And it does rather turn the Fourth Amendment on its head to complain about not the dearth but the plethora of grounds for believing that a pharmacy that is to be inspected is involved in criminal activity.

In *United States v. LaSalle National Bank,* 437 U.S. 298, 316–19, 98 S.Ct. 2357, 2367–69, 57 L.Ed.2d 221 (1978), however, the Supreme Court held that the Internal Revenue Service could not issue a civil summons for the sole purpose of assisting the Justice Department in a criminal prosecution, the Service having abandoned its efforts to impose additional civil liability on the taxpayer. That was an example of using civil process to enforce the criminal laws. But here (as in the many other cases that have distinguished *LaSalle,* such as *United States v. Gel Spice Co., supra,* 773 F.2d at 433) civil process is being used to enforce a civil record-keeping requirement, albeit one that is ancillary to a scheme of criminal law enforcement. The purpose of the requirement makes it inevitable that the government agencies that enforce it will be hoping to obtain evidence for use in criminal proceedings; but since Nechy does not question the lawfulness of the record-keeping requirement, he can hardly insist that it be enforced only against pharma-

cists not suspected of illegal conduct. Therefore this case comes within the general rule that if a search is objectively reasonable, the motives of the officers conducting it will not turn it into a violation of the Fourth Amendment. See *Scott v. United States,* 436 U.S. 128, 136–38, 98 S.Ct. 1717, 1722–24, 56 L.Ed.2d 168 (1978); *United States v. Causey,* 818 F.2d 354, 358 (5th Cir.1987). To this as to virtually all legal generalizations there are exceptions, as where the motive for the search is to deter a person from exercising his freedom of speech or to harass him because of his race or religion. But nothing like that is involved in this case.

Nechy argues further that the search was tainted by the participation of the Milwaukee police officers. This argument presents a question of first impression, alluded to but not resolved in *United States v. Bridwell,* 583 F.2d 1135, 1139 and n. 3 (10th Cir.1978). Nechy notes that the ostensible reason for the presence of police— to protect the unarmed compliance investigators from possible violence—is obviously incomplete. No law says that federal compliance investigators must go about unarmed; and in addition to protecting the investigators, the Milwaukee police officers—narcotics detectives all—assisted in the search, by counting and bundling prescriptions for controlled substances. Their participation may well have violated section 880(b)(2). That section provides that the entries and inspections shall be carried out by officers or employees designated by the Attorney General, which Milwaukee narcotics detectives are not. Maybe, as the government argues, the role of the detectives in counting and bundling receipts was not a sufficient participation in the entry or inspection itself to come within the statute; but we are doubtful. The statute authorizes the seizure of property as well as the inspecting and copying of records, and the detectives participated in the seizure.

The participation of policemen in a civil search (whatever its objectives) may seem troubling, both because it reinforces (though perhaps only atmospherically) the suggestion of a criminal dimension to the search and because the gravity of an inva-

sion of privacy depends in part on who does the invading—businessmen, like other people, being more reluctant to have armed policemen tramping around their premises uninvited than unarmed civil investigators. However, as pointed out in *New York v. Burger, supra,* where a similar objection was brushed aside, police officers do have civil as well as criminal responsibilities. See 107 S.Ct. at 2651; cf. *O'Connor v. Ortega,* —— U.S. ——, 107 S.Ct. 1492, 1505, 94 L.Ed.2d 714 (1987) (concurring opinion). Moreover, although the wording of subsection (b)(2) may suggest congressional sensitivity about police searches not based on probable cause to believe the search will uncover evidence of crime, this is far from certain, for nothing in the statute appears to forbid the Attorney General to designate members of the FBI, or other federal policemen, as inspectors. Yet the government's emphasis on the fact that the DEA's compliance investigators are unarmed civilians and that the participating local police officers were plainsclothesmen who though armed did not display their weapons may be a tacit acknowledgment that (b)(2) was intended to restrict participation in these civil searches to carefully designated federal agents.

 Even so, this would not justify our excluding the evidence obtained by a search in violation of (b)(2) from a criminal proceeding. Exclusion of evidence is a socially costly sanction for official misconduct; and proportionality has a role to play in designing sanctions for such misconduct, just as in designing punishments for crime. No longer, therefore, do technical defects in a warrant require or justify the exclusion from criminal proceedings of evidence seized in executing the warrant (see *United States v. Hornick,* 815 F.2d 1156, 1158 (7th Cir.1987), and cases cited there); and no more should technical defects in the execution of the warrant result automatically in exclusion. This point is especially compelling in the present case, where the defect was completely harmless. It was not even a "but for" cause of the seizure of the evidence used against the defendant. Had the police officers stuck to their assigned role of providing security, the only difference for Nechy would have been that collecting and bundling the prescriptions would have taken longer. That would not have done him any good. This is not a case where, if the government had complied with the law, it would not, or might not, have obtained the evidence that it used against the defendant. To use a violation of section 880(b)(2) to invalidate the search would be to put Nechy in a better position than he would have been in had no violation been committed. We have said (in reliance on abundant Supreme Court authority) that an exclusionary sanction is excessive if it produces such a result. See *United States v. Salgado,* 807 F.2d 603, 607 (7th Cir. 1986). This is such a case.

 So there was no reversible error in denying Nechy's motion to suppress, and we turn to his other ground of appeal. He was indicted and convicted of possession with intent to distribute, of distribution, and of aiding and abetting distribution, of a controlled substance. But, he says, the only crimes he committed involved dispensing, not distributing. The statute makes both distributing and dispensing illegal. 21 U.S.C. § 841(a)(1). He calls the discrepancy between charge and proof a fatal variance.

As a matter both of ordinary and statutory language, what Nechy, a pharmacist, did in selling drugs other than under valid prescription is indeed "dispensing," not "distributing." "The term 'dispense' means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing ... of a controlled substance." 21 U.S.C. § 802(10). Since "practitioner" includes a pharmacist licensed to dispense a controlled substance, see § 802(20), the fact that Nechy was not acting under the lawful order (valid prescription) of a doctor does not prevent him from being deemed an illegal dispenser, just as a doctor would be a dispenser if he gave a drug to a patient even though the doctor would not be doing so "pursuant to the lawful order of" anyone, see *United States v. Moore,* 423 U.S. 122, 137, 96 S.Ct. 335, 343, 46 L.Ed.2d 333 (1975) (dictum). Since Nechy was a dispenser, and since

under the statute a dispenser cannot also be a distributor—"The term 'distribute' means to deliver (*other than by* administering or *dispensing*) a controlled substance," § 802(11) (emphasis added)—Nechy was indicted and convicted for a different offense from the one he committed.

■ But there is no difference in proof, penalty, etc. between the crimes of distributing and of dispensing a controlled substance. The only difference is nomenclature; a pharmacist is a dispenser while someone who is not a pharmacist, doctor, etc. is a distributor. *United States v. Genser*, 710 F.2d 1426, 1429–31 (10th Cir.1983). The statute might as well say that persons who sell illegal drugs between January 1 and June 30 are distributors and persons who sell illegal drugs between July 1 and December 31 are dispensers but that otherwise the elements of the crime are identical, as are the punishments. Nechy was not impeded in his defense by the fact that he was charged with distributing rather than dispensing. The government was not trying to prosecute him for a crime for which the grand jury had not indicted him. And there is no danger that, having been convicted of distributing, Nechy may some day be prosecuted for having dispensed—the crime he actually committed, but not the crime charged in the indictment. Conviction or acquittal of either crime bars prosecution for the other, under the principle of double jeopardy. See *id.*

The variance between indictment and proof was harmless; and "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a). See, e.g., *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935); *United States v. Kramer*, 711 F.2d 789, 795 (7th Cir.1983); *United States v. Petti*, 459 F.2d 294 (3d Cir.1972).

Nechy's conviction is

AFFIRMED.