**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joe Philip MAESTAS, Defendant–Appellant.**

No. 90–1875.

United States Court of Appeals, Fifth Circuit.

Aug. 23, 1991.

Jeffrey G. Shrader, Bart N. Pruitt, (Court-appointed), Gibson, Ochsner & Adkins, Amarillo, Tex., for defendant-appellant.

Vicki C. Howard, Asst. U.S. Atty., Amarillo, Tex., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before KING, and DUHÉ, Circuit Judges, and SCHWARTZ, District Judge [1].

KING, Circuit Judge:

A jury convicted Joe Philip Maestas of being a convicted felon who knowingly and unlawfully possessed a firearm in and affecting interstate commerce, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Maestas raises two arguments on appeal. First, he contends that the district court erred in denying his motion to suppress the firearm because the police officer had insufficient cause to perform a warrantless search. Second, he contends that the introduction at trial of evidence that he pled guilty in state court to a misdemeanor for carrying the same firearm that was the subject of the federal trial violated his rights under the fifth and sixth amendments.

[1]. District Judge of the Eastern District of Louisiana, sitting by designation.

We hold that the search that uncovered the firearm was reasonable under the circumstances, and that the district court thus properly denied Maestas's suppression motion. We also hold that introduction of the state court guilty plea was proper as a party admission and did not violate any of Maestas's constitutional rights. Accordingly, we affirm Maestas's conviction.

## I. BACKGROUND

On February 5, 1990, at 9:00 p.m., Amarillo, Tex. police officer Kevin Black was dispatched to the residence of Yvonne Tenorio at 2106 Mirror Street in response to a burglary call made by Tenorio. Officer Black parked his car at 2104 Mirror. As he exited his vehicle and began to walk toward 2106, a pickup truck driven by Hector Morales with Maestas as a passenger pulled up in front of Black's squad car. Maestas got out of the truck appearing intoxicated. Black proceeded to question him. Maestas explained that he was visiting friends at the residence at 2104 Mirror, which to Black appeared vacant.

Black proceeded to the front of the residence at 2106 where Tenorio, the complainant, was waiting. Maestas then approached Black and Tenorio and told Tenorio in English that he needed to speak with her. As Maestas turned to walk away, Tenorio quietly indicated to Black that Maestas was the man who had burglarized her home, and that he had been living with her until very recently. Maestas then approached Tenorio and Black again and made additional statements to Tenorio in Spanish. As Maestas walked away, Tenorio told Black that Maestas had said he was going to get even with her for calling the police. Maestas then returned a third time, made additional statements in Spanish, and proceeded back to the truck. During the second two encounters between Maestas and Tenorio, Black noticed that Maestas displayed an aggressive, threatening demeanor. Tenorio appeared visibly shaken to Black and told Black that Maestas had threatened her again and that he had a gun in the truck.

Black then radioed for assistance and followed Maestas back to the truck. As Black reached the truck, he observed Maestas seated on the passenger side. He then observed Maestas lean forward a few inches. Black opened the passenger door and observed Maestas reach with his left hand down into a seat cover pocket which was located on the front of the seat between Maestas's legs. By this time, back-up assistance had arrived. Black ordered Maestas out of the pickup and directed him to stand at the rear of the truck. Black reached into the passenger compartment, felt the seat-pocket covers hanging from the front of the passenger seat, and pulled out an RG–23 model .22 caliber revolver. Maestas was then placed under arrest.

That same evening, another Amarillo officer was dispatched to Northwest Texas Hospital to investigate a shooting victim, Carlos Montenegro, with a gunshot wound to his leg. Montenegro identified Maestas at trial as the man who shot him, although Montenegro did not wish to press charges. The Amarillo police took possession of the bullet removed from Montenegro's leg and, following ballistics tests, confirmed that the bullet was fired from the same .22 revolver seized by Black from the pickup truck.

Maestas had a prior felony conviction on or about June 3, 1983, in a Colorado state court. On April 11, 1990, Maestas was charged in a one count indictment with being a convicted felon who knowingly and unlawfully possessed a firearm in and affecting commerce, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The following month, on May 10, 1990, Maestas, without counsel, pled guilty in the Potter County Court to a state misdemeanor charge of unlawfully carrying a weapon on February 5, 1990.

Maestas filed a motion to suppress in connection with the seizure of the .22 revolver. The motion was referred to a magistrate, who held an evidentiary hearing on June 27 and issued a Report and Recommendation denying the motion on July 18. The district court adopted the magistrate's report in its entirety. At trial, the govern-

ment introduced the gun over Maestas's renewed objection. Maestas stipulated to the state court misdemeanor plea for unlawful possession of a weapon, but objected to its introduction as a judicial admission. Maestas was found guilty after a one-day jury trial on August 7, 1990, and was subsequently sentenced to 105 months imprisonment and three years supervised release. This appeal followed.

## II. DISCUSSION

### A. *Motion to Suppress the Firearm* [2]

Maestas argues that Officer Black had neither probable cause nor reasonable suspicion, *see Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), sufficient to conduct the warrantless search of the truck. Although the government does not concede that Officer Black did not have probable cause, its argument focuses on whether the search satisfied the lower standard of cause set forth in *Terry*. We find more than enough evidence pointing to the conclusion that Officer Black made a lawful protective search for weapons within the bounds of *Terry* and *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

In *Terry*, the Court first recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880. Underlying this recognition was the notion that police officers should not be forced to ignore possible wrongdoing in their midst merely because they do not have the precise level of information needed to satisfy the standard of probable cause. *See*

*Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972). *Terry* therefore permits a police officer to undertake an "intermediate response," *Williams*, 407 U.S. at 145, 92 S.Ct. at 1923, if the facts and circumstances surrounding a particular encounter lead him to believe that criminal activity may be occurring and that he may face imminent danger. *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884.

Although *Terry* permits a warrantless search based on less than probable cause, the extent of the search must be carefully circumscribed. Because the purpose of such a search is to enable the officer to "tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him," *id.* at 23, 88 S.Ct. at 1881, the officer may only pat down the suspect's outer clothing in an effort to discover weapons. *Id.* at 30, 88 S.Ct. at 1884.

In *Long*, the Court extended the principles of *Terry* to automobile searches. *Long* neither expanded nor contracted the threshold level of cause necessary to justify a warrantless weapons search, but made clear that the same standard that supports a *Terry* search was fully applicable to automobile searches. *Long*, 463 U.S. at 1049, 103 S.Ct. at 3480. Likewise, the Court in *Long* made it clear that it was not permitting police officers to do anything more than conduct a limited search of those areas in which a weapon may be placed or hidden. *Id.* Because the underlying rationale for the "stop and frisk" exception in *Long*—the officer's self-protection in circumstances under which he reasonably would fear for his safety—is analogous to that supporting the exception in *Terry*, the scope of a search under *Long* may not

**2.** Although the evidence at the suppression hearing and at trial established that Maestas was a passenger in the truck and that he neither owned nor had borrowed it, the parties have not, at any point in these proceedings, raised any question as to his standing to challenge the legality of the search. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The possibility that Maestas did not have standing, however, does not affect our ability to decide this case, because standing to challenge a

search under the fourth amendment is not jurisdictional in the same sense as Article III standing. *See United States v. Nechy*, 827 F.2d 1161, 1164–65 (7th Cir.1987) (Posner, J.) (issue of fourth amendment standing is distinguishable from Article III standing and does not rob court of jurisdiction to decide merits of claim). Whether the government's failure to raise the issue was unintentional or a matter of tactics, it has been waived. *Id.* at 1165.

exceed that necessary to discover weapons in the passenger compartment which might pose a danger to the officer.[3] *Long*, 463 U.S. at 1049, 103 S.Ct. at 3480; *see also United States v. Basey*, 816 F.2d 980, 991 n. 20 (5th Cir.1987) (when officer has reasonable suspicion to make *Terry* stop he may search passenger compartment for self-protection); *United States v. Moore*, 786 F.2d 1308, 1316 (5th Cir.1986) (protective search of passenger compartment of automobile, limited to places where weapons may be hidden, permissible if officer possesses reasonable belief that suspect is dangerous and may gain immediate control of weapons).

The circumstances surrounding Officer Black's search of the truck demonstrate that he had reasonable suspicion, supported by articulable facts, to conduct the search. Moreover, the scope of the search remained within the bounds set by *Terry* and *Long*. Officer Black initially noted that Maestas was intoxicated when he exited the truck. He then observed Maestas acting in an aggressive and belligerent manner toward Tenorio while Black spoke with Tenorio. On at least three occasions, Maestas spoke with Tenorio; Tenorio appeared visibly shaken during and after these encounters and told Black that Maestas had threatened her. After Maestas spoke with Tenorio the third time, Tenorio told Black that Maestas had said he would get even with her and that he had a gun. As Maestas returned to the vehicle, Black felt the situation threatening enough to require backup assistance. Black then saw Maestas lean forward in the truck and believed that this indicated

an attempt to reach for something in front of him. At this point, given the aggressive actions Officer Black had observed and what he had been told by Tenorio, the facts supported the "rational inference[ ]," *Long*, 463 U.S. at 1049, 103 S.Ct. at 3481 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880), that Maestas was reaching for a concealed weapon in the truck's passenger compartment and that the weapon might pose a danger to Officer Black.

It is undisputed that, once Officer Black ordered Maestas out of the truck and made the decision to search, the search was limited to the area to which Maestas "would generally have immediate control," *Long*, 463 U.S. at 1050, 103 S.Ct. at 3481. *Long* fully supports the sort of protective sweep of an automobile interior for the limited purpose of uncovering weapons conducted by Officer Black in this case.[4]

Maestas makes much of the fact that Officer Black observed Maestas from the rear window of the truck and that Officer Black only saw Maestas lean forward a few inches. However, we decline his invitation to require "much more pronounced actions" before police officers in potentially volatile situations can take steps to protect themselves. The nature of the facts and observations that may form the basis for a permissible *Long*-type protective sweep are not intended to be applied in as mechanistic a manner as Maestas suggests. Indeed, to require any one particular fact or observation to conform to a pre-established standard before it could be used to support a weapons search would undermine the no-

---

3. The Court thus extended the "bright-line" rule of *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), which allowed a search of the entire passenger compartment upon a full probable cause arrest of its occupant. The Court reasoned in *Belton* that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon'...." *Id.* at 460, 101 S.Ct. at 2864 (quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969)). In *Long*, the Court again justified the broad scope of a passenger compartment

search by referring to the possibility that a suspect could "break away from police control and retrieve a weapon from his automobile." *Long*, 463 U.S. at 1051, 103 S.Ct. at 3482.

4. We thus reject Maestas's argument that the search was unnecessary to protect the safety of anyone in the vicinity of the truck because Maestas was in the truck with the door closed ready to drive away. *Long* rests upon the premise that suspects may pose a danger even when they have been detained *outside* the car. *See supra* note 2. No extended discussion is necessary to demonstrate that Maestas clearly could have posed a danger while inside the truck with a weapon.

tion that a police officer's reasonable suspicions may arise from the rational inferences of what he sees and hears. *See Long,* 463 U.S. at 1049, 103 S.Ct. at 3480 (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880); *cf. Texas v. Brown,* 460 U.S. 730, 742–43, 103 S.Ct. 1535, 1543–44, 75 L.Ed.2d 502 (1983) (plurality opinion of Rehnquist, J.) (probable cause for plain view seizure may be based on information officer has gained from previous experience).

Maestas further contends that reasonable articulable suspicion is lacking because Officer Black's reasonable suspicion was based in part on Tenorio's statements that Maestas was armed. Maestas contends that Officer Black was not entitled to rely on this statement because he knew nothing about Tenorio's reliability, veracity, or basis of knowledge. Moreover, he argues, the statement was uncorroborated. All of these contentions are erroneous in light of *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

In *Williams,* the Court rejected the argument that cause for a *Terry* stop can be based only on an officer's personal observations, and held that unverified information which might not be sufficient for obtaining a search warrant may still carry enough "indicia of reliability" to justify a forcible stop and frisk. *Id.* at 146–47, 92 S.Ct. at 1924. Although the informant in *Williams,* unlike here, was known to the officer and had supplied him with information in the past, Officer Black did not rely solely on Tenorio's statement. As we have discussed, the statement was combined with personal observation of Maestas's demeanor and movements within the truck, and translation of his threatening statements. Moreover, Tenorio was hardly an outside informant, as in *Williams*—she translated Maestas's statement about the

gun immediately after Maestas himself made it. In her frightened condition, her reliability was far from suspect.[5]

We conclude that Officer Black's observations and information that Maestas had a gun supported his limited search of the truck for weapons, and that the weapon he recovered was properly admitted into evidence at Maestas's trial.

**B.** *Introduction of the State Court Guilty Plea*

Maestas next argues that the introduction of his stipulated plea of guilty to the state misdemeanor charge of unlawfully possessing a firearm on February 5, 1990, resulted in an unknowing waiver of his fifth amendment privilege against self-incrimination and his sixth amendment rights to confront witnesses and to trial by jury.[6] It is well settled that a guilty plea is admissible in a subsequent collateral criminal trial as evidence of an admission by a party-opponent. *See, e.g., United States v. Holmes,* 794 F.2d 345, 349 (8th Cir.1986); *United States v. Andreadis,* 366 F.2d 423, 433 (2d Cir.1966), *cert. denied,* 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). Maestas argues, however, that the guilty plea evidence should have been excluded in this case because the state trial judge failed to inform him that the plea could be used against him in a subsequent federal criminal trial.

When a defendant mounts a collateral attack on a guilty plea, it is appropriate to examine the plea only if defects of a constitutional dimension are alleged. *See United States v. Howze,* 668 F.2d 322, 323 (7th Cir.1982). Maestas asserts that his plea could not have been "intelligent and voluntary," as required by *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709,

---

**5.** Maestas's citation to *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), is unavailing. Maestas appears to argue that *Gates* compelled Officer Black to assess Tenorio's reliability, veracity and basis of knowledge before relying on her information. *Gates,* however, replaced a "rigid demand that specific 'tests' be satisfied by every informant's tip" with a "totality-of-the-circumstances" approach, *id.* at 230–31, 103 S.Ct. at 2328, and, in any event,

concerned the test for probable cause, not the lower standard of reasonable suspicion.

**6.** At one point in his opening brief, Maestas states that introduction of the guilty plea violated his fourth, fifth and sixth amendment rights. However, he argues only the fifth and sixth amendment violations, and we can find no basis in the fourth amendment for excluding his plea.

1711, 23 L.Ed.2d 274 (1969), absent his knowledge that it could be introduced against him to prove an element of the federal crime. We reject this reasoning, however, because Maestas attempts to place responsibilities on state courts which they need not undertake in our system of dual sovereigns. We stated long ago in *Shelton v. United States*, 246 F.2d 571 (5th Cir.1957), *rev'd on other grounds*, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958), that a defendant pleading guilty must be "fully aware of the direct consequences...." *Id.* at 572 n. 2. In *United States v. Long*, 852 F.2d 975 (7th Cir.1988), the court explained why use of a state guilty plea in a subsequent federal proceeding is not a "direct consequence" of the plea:

> [T]he state court has no direct role in federal prosecutions. The state and federal systems are separate and distinct, and the defendant need only be informed of the direct consequences he may face within the particular system. Therefore, the state court, even if knowledgeable about federal criminal law, need not undertake to inform the defendant of his potential federal criminal liability: the nature of the state sentence was unaffected by the federal prosecution and sentence.

*Id.* at 979.

We recognized in *Shelton* that collusion between state and federal officials, misrepresentation, or an effort to hide the consequences of a plea might require a different result. *Shelton*, 246 F.2d at 572 n. 2; *see also Long*, 852 F.2d at 979. But there is nothing in the record of this case to indicate that the federal authorities made any efforts to pressure Maestas's waiver of rights in the state court. Indeed, on the day Maestas entered the plea in state court for unlawful possession of a weapon on February 5, he had already been indicted on the federal charge (which included possession of a firearm on February 5, 1990). Thus, he knew he was admitting to one of the elements of the crime for which he was charged in federal court.[7] In all other respects, the record reveals that Maestas was fully informed of his rights, including his right to counsel, and that his guilty plea was intelligent, knowing and voluntary as required under *Boykin*. We therefore find that the district court properly admitted the state court guilty plea.[8]

## III. CONCLUSION

For the foregoing reasons, the conviction is AFFIRMED.

---

**7.** The fact that Maestas pled guilty in the state case, therefore admitting that he had carried a firearm on February 5, 1990, as well as the fact that the guilty plea was not used to impeach Maestas, distinguishes this case from *United States v. Martinez*, 555 F.2d 1273 (5th Cir.1977). In *Martinez*, we held it was error for the district court to allow the government to introduce evidence of a prior conviction arising out of the same factual circumstances to impeach the defendant's testimony, stating that the evidence "bordered on directing a verdict against the accused." *Id.* at 1276. Our concern in that case, however, was with the value of the evidence as it related to the purpose of casting doubt upon the defendant's credibility. The government tried to use a *"present* conviction," *id.* at 1276 (emphasis in original), to do what can only be done—at least under the theory that a prior conviction is probative of a witness's present credibility—by use of a *past* conviction. This we found more prejudicial than probative.

In the present case, Maestas pled guilty to the earlier charge and stipulated to it before the district court. Moreover, Maestas never took the stand, so there is no question that the plea was not improperly used for impeachment purposes.

**8.** Maestas relies entirely on *United States v. Edwards*, 669 F.Supp. 168 (S.D.Ohio 1987), in which the court granted the defendant's motion to suppress evidence of his prior state court guilty plea on the grounds that he had not been informed that it could be used against him in the federal prosecution. To the extent that *Edwards* stands for the proposition that a state court's failure to advise of federal consequences *always* violates the defendant's rights under *Boykin*, we decline to follow it.