## State of Vermont v. Judy D. Welch

[624 A.2d 1105]

No. 90-392

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed October 30, 1992
Motion for Reargument Denied February 24, 1993

72

*Jeffrey L. Amestoy*, Attorney General, and *Susan R. Harritt*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*E.M. Allen*, Defender General, and *Anna E. Saxman* and *William Nelson*, Appellate Defenders, Montpelier, for Defendant-Appellant.

**Gibson, J.** Defendant Judy Welch appeals orders of the district court denying two motions to suppress evidence and two motions to dismiss. She was charged with concealing material facts in obtaining prescriptions for regulated drugs. 18 V.S.A. § 4223(a)(3) & (h). Defendant argues that her right to privacy was violated by a warrantless inspection of her prescription records at Rutland area pharmacies, that the investigation of her prescriptions for "doctor shopping" was tainted by confessions she made after signing an immunity agreement, and that she lacked the requisite mens rea for the alleged violations. We affirm.

## I.

On October 5, 1988, Judy Welch was working as a nurse at the Rutland Correctional Center (RCC). She was relieved at 2:30 p.m. by nurse Nancy McDonald, but before leaving for the day Welch went to a neighborhood pharmacy to pick up a prescription of Vicodan for an inmate. This was unusual because the pharmacy routinely delivered prescriptions. Later that after-

noon, McDonald discovered that the prescription contained ten Vicodan tablets instead of the twelve tablets indicated on the label, and that defendant's prescription-log entry showed that "10-12" tablets had been ordered. This, too, was unusual because prescriptions are normally ordered in a definite, not an approximate, amount. Checking with the pharmacy, McDonald confirmed that the prescription had contained twelve tablets. Later in the evening, Welch called McDonald at the correctional facility and asked if "everything was all right," an unusual call for her to make. McDonald reported these events, including the discrepancy in the pill count, to RCC Superintendent Michael O'Malley.

O'Malley, who knew that Welch had previously had a drug problem, met with her on October 7. At O'Malley's behest, Welch telephoned McDonald after the meeting and admitted that she had taken the two tablets. O'Malley took no further action regarding the incident. In March 1989, however, an employee of RCC wrote to the state's attorney alleging drug diversions from the RCC infirmary, and shortly thereafter, O'Malley received a letter from the state's attorney inquiring about "potential drug abuse" at RCC. O'Malley assigned Assistant Superintendent Stewart Robinson to investigate the matter.

On April 3, Robinson interviewed defendant as part of the internal RCC investigation. Defendant read and signed a so-called *Garrity* warning, see *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967), which informed her that any information or evidence she might provide could not be used against her in any criminal proceeding. She then admitted that she had taken the two Vicodan tablets from the prescription container in October. A summary of the internal RCC investigation was prepared on April 3.

As a result of the complaint to the state's attorney, Trooper Steven Brown of the Vermont State Police Drug Task Force began an independent criminal investigation. On or about March 24, 1989, he interviewed nurse McDonald, who related the events of October 5 and told him of defendant's admission that she had taken two Vicodan tablets. He also interviewed Robinson and O'Malley, who confirmed that defendant had admitted the Vicodan incident and had, in O'Malley's words, "fallen off the wagon." Brown already knew of defendant's pre-

vious drug problem. During the course of his investigation, Brown reviewed pharmacy files at the RCC, but did not examine personnel records or other files related to RCC's internal investigation. He attempted to interview defendant, but she refused and instead gave him a prepared statement that did not mention the October 1988 incident. After Brown concluded his investigation, the state's attorney decided not to bring criminal charges against defendant for diversion of the two Vicodan tablets.

Lt. Gary Boutin, one of Brown's supervisors, suggested a check of area pharmacies to see if defendant was "doctor shopping" — i.e., securing prescriptions for controlled substances from more than one practitioner. Brown called all the pharmacies in Rutland and obtained information on defendant's prescriptions from four of them. He discovered that some of the prescriptions overlapped. He went to the pharmacies, obtained the original prescriptions, and then visited the practitioners involved. Three of them signed statements to the effect that defendant had not told them about existing prescriptions, a fact that would have been material to a decision to prescribe medication for her. In these interviews, Brown saw no patient files and sought only to verify the prescription evidence he already had. On the basis of this investigation, the State charged defendant with four counts of concealing a material fact in obtaining regulated substances.

## II.

Defendant first contends that Trooper Brown violated her rights under the Fourth Amendment to the United States Constitution and Chapter I, Article 11 of the Vermont Constitution when he inspected her pharmacy records without a warrant. Defendant argues that she has a legitimate expectation of privacy in her pharmacy records because they are medical records and society recognizes the confidentiality of medical records. The State contends that there is no legitimate expectation of privacy in prescription records that must be kept readily available, pursuant to Vermont law, for inspection by authorized officials. The trial court found that a privacy interest existed, but concluded that no search warrant was required because extensive federal and state regulatory schemes govern controlled

substances and the records fell within the "pervasively regulated industry" exception to the warrant requirement. See *New York v. Burger*, 482 U.S. 691, 702 (1987) (because owner of automobile junkyard, a closely regulated industry, has reduced expectation of privacy, Fourth Amendment standard of reasonableness for government search has lessened application). We discuss first whether defendant possesses a privacy interest in her pharmaceutical records.

## A.

As we recently noted, the privacy right protected by both the Fourth Amendment[1] and Article 11[2] is the right to be free from unreasonable government intrusions into legitimate expectations of privacy. *State v. Kirchoff*, 156 Vt. 1, 6, 587 A.2d 988, 992 (1991). While this "core value," *id.*, is the same under both the United States and Vermont Constitutions, our Article 11 jurisprudence has diverged from the United States Supreme Court's analysis of the Fourth Amendment. *State v. Berard*, 154 Vt. 306, 310, 576 A.2d 118, 120 (1990) (federal law "tends to derogate the central role of the judiciary in Article Eleven jurisprudence"); *State v. Wood*, 148 Vt. 479, 487, 536 A.2d 902, 907 (1987) (in focusing away from judicial review and curtailing scope of protected right to be free from unlawful governmental conduct, federal test is incompatible with Article 11).

Under the Fourth Amendment, an individual must demonstrate a legitimate expectation of privacy in the place searched or the items seized before the court will consider

---

[1] The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[2] Chapter I, Article 11 of the Vermont Constitution states:

That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

whether the search was unreasonable. *Rakas v. Illinois*, 439 U.S. 128, 143–44 n.12 (1978). Defendant places particular emphasis on the *Rakas* criterion that the privacy interest must derive from "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* Defendant does not assert any property interest in the prescription records, but contends that prescription records are confidential medical records and that her legitimate expectation of privacy derives from society's recognition of the privacy of such records.

Defendant may not have standing to assert her Fourth Amendment claim, see *Whalen v. Roe*, 429 U.S. 589, 603–04 (1977) (limited official access to prescription records for dangerous drugs does not implicate patient's privacy interests), but we need not decide that issue today. We reach the merits of defendant's claim under Article 11 of the Vermont Constitution and find our analysis would be the same under either the federal or state constitutions.

■ In deciding whether defendant has standing to assert her privacy claim under Article 11 of the Vermont Constitution, we look at the objective relationship of the person to the place searched or items seized, as opposed to a subjective evaluation of the legitimacy of the person's expectation of privacy. *Wood*, 148 Vt. at 489, 536 A.2d at 908; see also *Kirchoff*, 156 Vt. at 10, 587 A.2d at 994 (inquiry is objective — i.e., whether reasonable person should know occupant sought to exclude public). A defendant "need only assert a possessory, proprietary or participatory interest in the item seized or the area searched to establish standing to assert an Article Eleven challenge." *Wood*, 148 Vt. at 489, 536 A.2d at 908. Here, defendant can claim no possessory or proprietary interest in the pharmacies or their records, and the term "participatory interest" is not defined in our cases; however, the dictionary defines the word "participate" as follows: "To receive or have a part or share of; to partake of; experience in common with others . . . ." Black's Law Dictionary 1118 (6th ed. 1990). The Supreme Court of New Jersey has defined "participatory" to "connote[] some involvement in the underlying criminal conduct" that generated the seized evidence. *State v. Mollica*, 114 N.J. 329, 339–40, 554 A.2d

1315, 1321 (1989). It accorded standing to a defendant, whose gambling activities generated certain telephone toll calls, to challenge the seizure of records related to calls that were made from a codefendant's hotel room. *Id.*

In the instant case, it was defendant whose illicit actions gave rise to the pharmaceutical records. Further, patients, including defendant, share with their pharmacists an expectation that information obtained in an inspection of their prescriptions will not be disclosed except in certain limited ways. 18 V.S.A. § 4211 (access to records barred to all but authorized officials, and no person having knowledge by virtue of his office of any such record shall divulge such knowledge, except in connection with a prosecution or licensing proceeding).

In so holding, we reject defendant's claim that her privacy interest in the pharmacy records is predicated upon doctor-patient confidentiality. Neither the statute, 12 V.S.A. § 1612(a), nor the evidentiary rule, V.R.E. 503, includes pharmacists among the professionals covered by the patient's privilege. The reason may be that the communications involved in pharmacy records are between a prescriber and a pharmacist, not between a prescriber and patient. But even if pharmacists were included, the rules of evidence exempt from privilege any report of a medical condition "required to be made by statute." V.R.E. 503(d)(6). Under 18 V.S.A. § 4217, it is the duty of every doctor and hospital to report promptly to the board of health all cases wherein a person has been or is being treated for drug abuse. We are satisfied that there is no patient's privilege available to defendant herein with respect to her pharmaceutical records. We agree instead with the trial court, that defendant does have a privacy interest that derives from her expectation that those records cannot be arbitrarily disclosed, and hold that she has standing to raise her claim under Article 11. We move now to a consideration of the merits of her claim.

### B.

Under Article 11, a search requires a warrant and probable cause except in exceptional circumstances which make the warrant and probable-cause requirement impracticable. *Berard*, 154 Vt. at 310–11, 576 A.2d at 120–21. Article 11 does not

contemplate an absolute prohibition on warrantless searches or seizures, but circumstances under which warrantless searches or seizures are permitted must be jealously and carefully drawn. *State v. Jewett*, 148 Vt. 324, 328, 532 A.2d 958, 960 (1986). Our analysis in the instant case involves two questions: first, whether the inspection of defendant's prescription records was justified as an exception to the warrant requirement, and second, whether authority for a warrantless inspection may be used to gather criminal evidence regarding an individual's prescription activity.

1.

The trial court adopted the "pervasively regulated industry" exception to the warrant requirement and concluded that the warrantless inspection of prescriptions for controlled substances was reasonable. This exception to the warrant requirement has been applied to allow warrantless administrative inspections of businesses that are closely regulated by the government where such inspections are necessary for effective enforcement of the law. See *Burger*, 482 U.S. at 699–701, and cases cited therein. "[W]here the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *Id.* at 702. Warrantless inspections have been upheld in cases involving a liquor dealer, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970), a gun dealer, *United States v. Biswell*, 406 U.S. 311, 315–16 (1972), a mining company, *Donovan v. Dewey*, 452 U.S. 594, 605 (1981), and an automobile junkyard, *Burger*, 482 U.S. at 712. We believe the state's interest in regulating pharmacies and controlling the illicit use of drugs is as great as that of the federal government in regulating the just-named industries. See *Whalen*, 429 U.S. at 598 (state has "vital interest in controlling the distribution of dangerous drugs"); *Commonwealth v. Lipomi*, 385 Mass. 370, 381, 432 N.E.2d 86, 93 (1982) (state interest in inspection of pharmacies is as urgent as federal regulatory interests in liquor and gun cases).

The "pervasively regulated industry" exception has been adopted in several states in litigation involving owners or pro-

prietors of pharmacies. See *Mendez v. Arizona State Board of Pharmacy*, 129 Ariz. 89, 91, 628 P.2d 972, 974 (1981); *Hosto v. Brickell*, 265 Ark. 147, 153, 577 S.W.2d 401, 405 (1979); *Lipomi*, 385 Mass. at 381, 432 N.E.2d at 93; *State v. Rednor*, 203 N.J. Super. 503, 508, 497 A.2d 544, 547 (1985); *People v. Curco Drugs, Inc.*, 76 Misc. 2d 222, 231, 350 N.Y.S.2d 74, 84 (Crim. Ct. 1973); *Poindexter v. State*, 545 S.W.2d 798, 800 (Tex. Crim. App. 1977). Federal courts have upheld inspections of pharmacy records on the less-than-probable-cause standard of an administrative warrant. See 21 U.S.C. § 880(d)(1) (probable cause to issue administrative inspection warrant is "valid public interest in the effective enforcement of this subchapter or regulations"); *United States v. Nechy*, 827 F.2d 1161, 1165 (7th Cir. 1987) (literal reading of § 880 means all investigator had to show in order to secure administrative warrant was that drugstore handled controlled substances); *United States v. Schiffman*, 572 F.2d 1137, 1141 (5th Cir. 1978) ("valid public interest" is constitutional standard for administrative warrant, even though less stringent than probable cause for criminal search).

█ Vermont has long required anyone selling potentially dangerous drugs, including narcotics, to keep accurate records. As early as 1904, the Legislature required that such records specify "the kind and quantity of the article sold, and the time when, and the name of the person to whom such sale is made, which record shall be open to all health officers, members of the state board of health and state officials who may wish to examine the same." 1904, No. 143, § 13. In 1915, the Legislature required prescriptions for the use of narcotics. Records of their sale were to be kept for not less than two years, and to be "at all times open to inspection by [health officials and] police authorities and police officers of cities and towns." 1915, No. 197, § 4. In 1945, the Legislature adopted the Uniform Narcotic Drug Act, 1945, No. 113, which put into place many of the statutory provisions still in effect today, including the requirement that pertinent records be open to inspection by state and federal officials responsible for enforcing narcotics laws. *Id.* § 17. In short, the Legislature has consistently recognized the state's interest in regulating the drug industry and that official access to prescription records is critical to effective drug enforcement.

We conclude that Vermont's pharmaceutical industry qualifies as a "pervasively regulated industry."

Pronouncing an industry "pervasively regulated" will not alone validate a warrantless inspection. The United States Supreme Court has held that "[i]n the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute." *Biswell*, 406 U.S. at 315. In *Burger*, the Court upheld, against a Fourth Amendment challenge, New York's regulation of the automobile junkyard industry, which allowed warrantless inspection of required records of automobile parts, because the statute satisfied three criteria necessary to make the inspections reasonable: (1) the state must have a substantial interest in regulating the industry, (2) regulation must reasonably serve the achievement of state interest, and (3) the statute must inform the industry that inspections will be made on a regular basis and must place appropriate restraints upon the discretion of the inspecting officers. *Burger*, 482 U.S. at 702–03.[3]

Taking each *Burger* criterion in turn, we first find, as already stated, that the state has a substantial interest in the regulation of dangerous drugs. We conclude, second, that Vermont's statute permitting authorized persons warrantless access to prescription records of controlled substances reasonably serves the achievement of that interest. See *Whalen*, 429 U.S. at 597 (New York central reporting system allowing authorized personnel to inspect without warrant the prescription records of users of Schedule II drugs "is manifestly the product of an orderly and rational legislative decision"). At present, chapter 84 of Title 18 regulates the possession and control of certain classes of drugs. 18 V.S.A. §§ 4201–4248. The department of public safety is charged with the duty of enforcing the drug laws of the state, *id.* § 4218(a); § 4218(b) gives its authorized

---

[3] The New York Court of Appeals, in a split decision, recently ruled, however, that the statute at issue in *Burger* violates the New York Constitution's guarantee against unreasonable searches and seizures because (1) the essential element of pervasive governmental supervision is lacking, and (2) the statute fails to set forth appropriate guidelines or restrictions for warrantless searches. *New York v. Keta*, 60 U.S.L.W. 2656 (April 2, 1992).

agents access·"at all times . . . to all orders, prescriptions and records kept or maintained under [chapter 84]."[4] Obtaining or attempting to obtain a regulated drug by fraud or deceit or by concealment of a material fact is prohibited under chapter 84. *Id.* § 4223. Recognizing the privacy interest of the individual, the Legislature has appropriately limited inspections to specifically authorized federal and state officers and prohibited disclosure of knowledge obtained during an inspection, except in connection with a criminal prosecution or licensing proceeding. See *id.* § 4211. Although § 4218 allows access "at all times," no provision is made for warrantless entry of closed premises. It is a reasonable inference that the Legislature intended to authorize inspections only during normal business hours, and we have no reason to believe the Legislature intended otherwise. Vermont's statutes differ from the New York scheme challenged in *Whalen* in that Vermont has no central reporting system and permits a broader group of personnel to inspect prescriptions. These differences, however, are differences in implementation and do not affect the reasonableness of warrantless inspection as a form of regulation.

In further discussion of the second criterion, the *Burger* Court held that the New York regulations of automobile junkyards permitting warrantless inspections were not only reasonable but were also necessary. The Court analogized the exigency facing the police in their inspection of the junkyard in *Burger* to that facing the investigators seeking to inspect a gun dealer's storeroom in *Biswell*, namely, that in order for the deterrent function of the regulations to be effective, "'unan-

---

[4] Other sections of chapter 84 also require that drug records and prescriptions be kept readily available for inspection: 18 V.S.A. § 4210(d) (records of authorized sale or dispensing of drugs to be kept for three years "subject to inspection by a federal officer or an officer of this state . . . engaged in the enforcement of the federal drug laws or of this chapter"); § 4211 (prescriptions and records "shall be open for inspection only to federal or state officers"); § 4213(c) (each party to transaction of sale by duly licensed manufacturer of regulated drugs to keep record for three years "in such a way as to be readily accessible for inspection"); § 4215(a) (pharmacist shall keep record of prescriptions, with full name and address of patient, for period of three years, "so as to be readily accessible for inspection by a federal or state officer . . . engaged in the enforcement of the federal drug laws or of this chapter.").

nounced, even frequent, inspections are essential.'" *Burger*, 482 U.S. at 710 (quoting *Biswell*, 406 U.S. at 316). The need for authority to conduct warrantless inspections of pharmacy records arises from the same exigency. Indeed, federal law prohibits anyone from refusing to make, keep, or furnish records required to be kept under the Controlled Substances Act. 21 U.S.C. § 842(a)(5). Although it may be argued that the defendant in this case, a customer and not a pharmacist, was never in a position to alter or hide pharmacy records, this does not affect the need for official authority to inspect those records without a warrant. To hold otherwise would place investigators in the curious position of having to secure a warrant in order to examine records which it is unlawful for the pharmacist to refuse to provide. We address this question further in our discussion of the use of inspection authority in gathering criminal evidence, below.

With respect to the third *Burger* criterion, the Supreme Court stated that "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703. We believe the Vermont statutes perform these functions. Pharmacists may not dispense drugs without obtaining a license, 26 V.S.A. § 2042, and this necessarily implies knowledge of their record-keeping obligations. The Legislature has limited inspections to specifically authorized federal and state officers. 18 V.S.A. § 4211. It has also limited the scope of those inspections to required records and to enforcement of chapter 84 provisions only. *Id.*; see also *Olson v. State*, 287 So. 2d 313, 314 (Fla. 1973)(inspections and warrantless searches authorized under controlled substances regulations cannot be used to further investigations for violations of other chapters of Florida statutes). Thus, we are persuaded that the statutory scheme satisfies the three criteria deemed necessary in *Burger* to make warrantless inspections reasonable. See *Burger*, 482 U.S. at 702–03.

We therefore hold that the warrantless inspection of pharmacy records maintained under Title 18, chapter 84, is permissible, and agree with the trial court that the inspection un-

dertaken by Trooper Brown in this case conformed to statutory authority and was reasonable.

2.

■ Next, we consider whether a warrantless inspection may be used to gather evidence for a criminal prosecution. Some jurisdictions have held that the exception to the warrant requirement applies only to routine administrative inspections, not to criminal investigations. See *Commonwealth v. Frodyma*, 386 Mass. 434, 440, 436 N.E.2d 925, 929 (1982); *State v. Penn*, 61 Ohio St. 3d 720, 726, 576 N.E.2d 790, 794 (1991). In *Burger*, the United States Supreme Court observed, however, that administrative regulations "may have the same ultimate purpose as penal laws," 482 U.S. at 713, and that the inspecting officers in that case acted within their regulatory authority when they examined vehicle parts to ascertain if the vehicles had been stolen. *Id.* at 716; see also *Nechy*, 827 F.2d at 1167 (where inspection of pharmacy records was reasonable, and evidence of criminal violations was obtained, "the motives of the officers conducting it will not turn it into a violation of the Fourth Amendment"); *United States v. Acklen*, 690 F.2d 70, 74 (6th Cir. 1982) (administrative standard of probable cause sufficient for warrant even where inspection was in pursuit of criminal evidence); *Rednor*, 203 N.J. Super. at 509, 497 A.2d at 547, and cases cited therein ("In determining the constitutionality of a search, we concern ourselves with the propriety of the conduct, not the motivation of the searcher."). In the instant case, Trooper Brown's access was lawful, and we hold that his enforcement powers, which include enforcement of criminal violations of 18 V.S.A. § 4223, under which defendant herein was charged, allowed him to look at prescription records in furtherance of his investigation.

Finally, we address defendant's claim that 12 V.S.A. § 1612(a) and V.R.E. 503 prohibited the prescribers in this case from disclosing any information to Trooper Brown when he interviewed them to verify the prescriptions. The trial court concluded that any information communicated to a prescriber by defendant was not privileged under 18 V.S.A. § 4223(b), which nullifies any privilege where the communication is made in an attempt to obtain drugs illegally. Defendant argues that this is circular

reasoning whereby the State may declare information non-privileged *after* it has already engaged in improper interviews in order to gather evidence of violations.

Interviews with prescribers are not dealt with in chapter 84. We agree that the trial court's reasoning raises a circularity, but we do not concede that the interviews here were improper. Without deciding whether or not the information communicated to the prescribers and thence to Trooper Brown was privileged, we find that any error was harmless. At the time of the interviews, Brown already had in his possession prescriptions that indicated probable violations by defendant. He sought merely to verify that the prescriptions had indeed been written by each prescriber, and elicited from them the opinion that had they been aware of a concurrent prescription from another prescriber, their own prescribing decisions would have been affected. Of course, prescribers of dangerous drugs are themselves subject to regulatory provisions pursuant to chapter 84. See, e.g., 18 V.S.A. § 4210(a), (d) (physicians must keep records, subject to inspection by authorized federal and state officers, of all regulated drugs received, sold, administered, dispensed or professionally used); *id.* § 4217 (physicians must report all cases of drug abuse). If there was error here, it was harmless.

In sum, we hold that defendant cannot prevail in her challenge to the constitutionality of the warrantless inspection of her prescription records at the various pharmacies.

## III.

Defendant next argues that Brown's doctor-shopping investigation was prompted by knowledge of involuntary statements she made to RCC personnel in which she admitted taking the Vicodan tablets. Those admissions, she claims, tainted any evidence obtained by Brown, which therefore should have been suppressed. The trial court agreed that her statements were made under threat of being fired, and granted her motion to suppress the statements she made to Superintendent O'Malley on October 7, 1988, those she made to nurse McDonald over the telephone on October 7, 1988, and those made to Assistant Superintendent Robinson at the interview on April 3, 1989. The

court did not suppress evidence gathered by Brown at the Rutland pharmacies, finding that his investigation had proceeded independently from the RCC investigation.

Under both the United States and the Vermont Constitutions, a confession must be voluntary in order to be used against a criminal defendant. *Chambers v. Florida*, 309 U.S. 227, 239 (1940); *State v. Badger*, 141 Vt. 430, 450–51, 450 A.2d 336, 348 (1982). Statements made "under threat of removal from office," like those defendant made in this case to O'Malley, McDonald, and Robinson, are involuntary. See *Garrity*, 385 U.S. at 500. Defendant's statements were properly suppressed, therefore, and any evidence gathered as a product of those statements would be tainted. See *Badger*, 141 Vt. at 440–41, 450 A.2d at 342–43 (evidence that is the product of an initial illegality is tainted and should be suppressed unless purged of the taint). Further, if the State has used the product of coerced statements as a "springboard" to future proceedings, the State must demonstrate an independent source for its evidence. *In re Hill*, 149 Vt. 431, 439–40, 545 A.2d 1019, 1025 (1988); see also *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (inquiry is whether the evidence objected to by defendant was obtained "'by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'") (quoting Maguire, Evidence of Guilt 221 (1959)).

Brown's inquiry began in March 1989 following a letter to the state's attorney from an RCC employee. Brown learned of defendant's admissions during his interview with McDonald on or about March 24, 1989, after defendant's talk with O'Malley but before her talk on April 3 with Robinson when she signed the *Garrity* warning. Suppressed statements therefore mingled with independent observations by McDonald. The independent observations, however, indicated to a virtual certainty that Welch had taken the Vicodan tablets. Among these observations were defendant's unusual behavior in personally retrieving the inmate's prescription, the missing tablets, the range "10-12" noted in the medication log, and the call that evening from defendant asking if everything was all right. It was not necessary, therefore, for Brown to "exploit" the suppressed statements in order to build a case against defendant.

 Defendant argues that Lt. Boutin's suggestion to check the pharmacies was itself tainted by knowledge of defendant's admissions, but the trial court found that Lt. Boutin suggested the pharmacy check because of his experience, his prior knowledge of defendant's drug problem, and McDonald's observations. The court found further that Brown declined the offer of O'Malley and Robinson to review RCC personnel files, its records, or its internal investigation materials, and the court concluded that the State's case was not predicated upon the RCC internal investigation or upon any RCC records or personnel files. We agree that the record shows an independent basis for Brown's inspection of the pharmacy records. Defendant's motion was properly denied.

## IV.

Defendant's next claim is that the *Garrity* warning immunized her from prosecution based on her statements to Robinson on April 3. In addition, she argues that Robinson was acting on behalf of the State when he initiated the interview, and therefore, she is immune pursuant to 12 V.S.A. § 1664.

 The rule in *Garrity* and defendant's signature on the "Employee Warning" form foreclose the use of her statements or any evidence derived from those statements in subsequent criminal proceedings. *Garrity*, 385 U.S. at 497–98. But defendant's argument on this point is essentially a reworking of the "taint" argument, and is consequently meritless. We have held that the trial court's finding of an independent source for the State's case on the doctor-shopping charges is supported by the record. Immunity under *Garrity* is not implicated here.

Defendant also claims immunity under 12 V.S.A. § 1664. This statute grants authority to immunize individuals compelled to testify in court or grand jury proceedings who wish to invoke their right against self-incrimination. Their testimony, and any evidence derived directly or indirectly from it, cannot be used in subsequent criminal proceedings against them. Defendant asserts that the Corrections Department and the State are the same entity, because Brown needed no subpoena in order to see the prescription records at the RCC. She contends that Robinson was acting on behalf of the State when he provided defend-

ant with the Employee Warning. She concludes that she is, therefore, immunized under § 1664 and that the State must prove "beyond a reasonable doubt that any proffered evidence was derived from sources totally independent of the compelled testimony." 12 V.S.A. § 1664(a).

Defendant's conclusion is groundless. Immunity applies only to those called to testify in a proceeding before or ancillary to a court or grand jury and who wish to invoke their rights against self-incrimination. The statute makes no reference to administrative proceedings. *Id.* Moreover, even if we were to find that the State and the Corrections Department are the same entity, Robinson had no statutory authority to grant immunity. That prerogative belongs solely to the presiding judge, at the request of the attorney general or state's attorney. *Id.* § 1664(b), (c); see *State v. Hamlin*, 146 Vt. 97, 107, 499 A.2d 45, 52 (1985). Further, as we have previously noted, Brown possessed independently acquired information, separate and apart from any statements made by defendant, that justified the prosecution. We find no error in the trial court's rejection of defendant's immunity arguments.

## V.

Finally, defendant argues that the State failed to prove that she knowingly concealed a material fact when she obtained overlapping prescriptions for regulated drugs from different practitioners. The State does not dispute that 18 V.S.A. § 4223(a)(2) requires a "knowing" mens rea, but argues that the evidence was sufficient to prove beyond a reasonable doubt that defendant concealed material facts by deliberately withholding information about her prescriptions. The trial court agreed.

Intent must often be inferred from what a person does, and proved by circumstantial evidence. *State v. Cole*, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988). The definition of "conceal" is "to hide, secrete, or withhold from the knowledge of others," Black's Law Dictionary 288 (6th ed. 1990), all of which connote intentional, knowing conduct. The trial court found that defendant was a trained nurse whose job at the RCC included dispensing drugs to inmates, and that the overlapping prescriptions from different dispensers all involved prescrip-

tions for the very same drug. The court concluded that a reasonable jury could find beyond a reasonable doubt that defendant had concealed the material fact of a prior prescription and obtained drugs in violation of the law. We are satisfied that the evidence was sufficient to support beyond a reasonable doubt the court's conclusion that defendant had concealed material information.

*Affirmed.*

**Johnson, J.,** dissenting. Today, the majority rules that the police have unlimited access to the prescription records of every pharmacist in the state of Vermont and may, without warrant or probable cause, search those records in hopes of finding violations of law, not by pharmacists, but by patients. In other words, as a consequence of today's ruling, the prescription records of all persons held by a Vermont pharmacist are open to unrestricted surveillance by the police.

One of the great conservative justices of the United States Supreme Court once observed that "[t]he history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States*, 318 U.S. 332, 347 (1943) (Frankfurter, J.). The requirements of probable cause and valid search warrants are surely among the most valued procedural safeguards against unreasonable searches and seizures contained in our constitution. An insistence upon the observance of these requirements is one of the principal defining qualities between totalitarian governments and governments devoted to the protection of the liberties of free men and women. Today's decision, albeit motivated by a well-meaning desire to curb the abuse of prescription drugs, represents a perilous step away from these constitutional values.

The majority permits the warrantless search in this case based on an exception to the warrant requirement for administrative searches of commercial enterprises. This is despite the fact that, from the outset, the State admits the search was aimed at gathering criminal evidence against an individual patient rather than conducting a routine administrative inspection of a regulated business. Because I believe that allowing warrantless searches to uncover criminal evidence under the guise of the administrative search exception undermines Arti-

cle 11 of the Vermont Constitution and disregards our recent case law interpreting that constitutional provision, I dissent.

Article 11 protects the people of this state from unreasonable, warrantless governmental intrusions into their private affairs. *State v. Kirchoff*, 156 Vt. 1, 10, 587 A.2d 988, 994 (1991). There is little doubt, and indeed both the trial court and the majority agree, that individuals have a privacy interest in their prescription records. Such records "contain extremely private and potentially embarrassing information" about the patient. *Commonwealth v. Slaton*, 383 Pa. Super. 301, 328, 556 A.2d 1343, 1356 (1989) (Kelly, J., concurring and dissenting) (citing law review articles regarding confidentiality of health records), *aff'd*, 530 Pa. 207, 608 A.2d 5 (1992). They may disclose highly personal facts concerning a person's lifestyle, ailments, or sources of stress and anxiety. See *Roe v. Ingraham*, 480 F.2d 102, 108 n.7 (2d Cir. 1973) (members of public know ailments for which drugs commonly prescribed). These are matters of great sensitivity that go to the heart of our concerns for privacy. This fact is recognized by the very statutory provision that permits inspection of pharmacy records, which is entitled "Records confidential." See 18 V.S.A. § 4211. That provision allows inspection "*only* to federal or state officers or their specially authorized agent whose duty it is to enforce the federal drug laws," and forbids those who gain knowledge of any prescription from divulging such knowledge, except in connection with a prosecution. *Id.* (emphasis added); see also V.R.E. 503 (patient has privilege to prevent "any other person" from disclosing confidential communications made for purposes of treatment).

Where a privacy interest is implicated, warrantless searches are permitted only in exceptional circumstances that are factually and narrowly tied to an exigency or special needs. See *State v. Savva*, 159 Vt. 75, 87, 616 A.2d 774, 781 (1991); *State v. Berard*, 154 Vt. 306, 312, 576 A.2d 118, 121 (1990). An exigency is created by particular circumstances of the moment, not by shifts in the political winds or by society's "perceived exigencies of the day." See *Kirchoff*, 156 Vt. at 12, 587 A.2d at 995–96. Thus, the trial court's allusion to the "drug crisis" cannot limit the protection afforded by our constitution against intrusive governmental searches. See *People v. Scott*, 79 N.Y.2d 474, 501, 593 N.E.2d 1328, 1345, 583 N.Y.S.2d 920, 937 (1992) (respon-

sibility of judicial branch not to respond to temporary crises or shape law to advance goals of law enforcement, but rather to safeguard constitutional rights). Moreover, when "special needs" require warrantless searches in certain regulatory contexts, we have always insisted that such searches be carried out through objective guidelines that preclude law enforcement officers from targeting specific individuals. See *Berard*, 154 Vt. at 314, 576 A.2d at 122 (routine search of prisoners' cells); *State v. Record*, 150 Vt. 84, 88, 548 A.2d 422, 425 (1988) (random DUI roadblock). In short, this Court has permitted warrantless regulatory searches in circumstances evincing special needs, but only when explicit guidelines ensure that the searches are not a pretext for singling out individuals.

Against this backdrop, the majority permits the police to inspect the prescription records of an individual based on an officer's hunch that they will provide evidence that the individual has committed a crime. The majority arrives at its holding by concluding that the warrantless inspection was a proper search of a "pervasively regulated" business. This is a remarkable conclusion considering that the "pervasively regulated industry" exception adopted by the majority is an exception to the warrant requirement of an *administrative* search, and that not even the State contends that this particular search was administrative in nature. Therefore the warrantless search could only be supported by exigent circumstances or special needs, none of which was present here.

The application of the administrative search exception is disturbingly ironic in this case considering that, because of our aversion to warrantless searches, we have refused to follow federal precedents that derogate "the central role of the judiciary in Article Eleven jurisprudence." *Berard*, 154 Vt. at 310, 576 A.2d at 120; see also *State v. Wood*, 148 Vt. 479, 487, 536 A.2d 902, 907 (1987) (judiciary must "review and restrain overreaching searches and seizures by the government"). Yet, today the majority permits governmental intrusion that would not be permitted even under federal law. The federal counterpart to § 4211, 21 U.S.C. § 880, requires an administrative warrant, albeit under a diminished standard, to inspect pharmacy records unless the officer has the consent of the owner or there is an emergency situation. That statute contains another provi-

sion requiring "probable cause" for the issuance of search warrants "relating to offenses involving controlled substances." 21 U.S.C. § 879. The fact that the federal law includes a traditional warrant provision strongly suggests that searches of pharmacy records undertaken to collect evidence of a crime requires a full-blown warrant based on probable cause. See *Commonwealth v. Frodyma*, 386 Mass. 434, 444–45, 436 N.E.2d 925, 932 (1982).

Nothing in the language of § 4211 suggests that the provision was intended to do anything more than to provide the authority for officers to make random, routine compliance inspections of the records of controlled premises. Cf. *Kirchoff*, 156 Vt. at 11–12, 587 A.2d at 995 (statutory provisions providing the public with certain privileges on private land do not evidence intent to limit landowners' right to pursue their affairs free from unregulated governmental intrusion). It is highly questionable whether the generally worded provision, which merely states that pharmacy records shall be open for inspection by law enforcement officers to enforce the drug laws, sufficiently limits the scope of bona fide administrative searches to pass constitutional muster under the test recently enunciated by the United States Supreme Court. See *New York v. Burger*, 482 U.S. 691, 703 (1987) (statute permitting warrantless administrative searches must limit discretion of inspectors, as well as time, place and scope of searches); *Scott*, 79 N.Y.2d at 501, 593 N.E.2d at 1344, 583 N.Y.S.2d at 936 (statutory provision allowing warrantless administrative searches of vehicle-dismantling businesses held to violate state constitution because only restriction statute contained is requirement that searches occur during business hours). But certainly it cannot authorize warrantless searches against individuals. If the legislature did intend the provision to allow police to make warrantless inspections of the prescription records of individuals suspected of criminal activity, then the statute violates Article 11 of the Vermont Constitution.

The primary evil Article 11 sought to avoid was the issuance and enforcement of general warrants. *Record*, 150 Vt. at 85, 548 A.2d at 423 (citing *Lincoln v. Smith*, 27 Vt. 328, 346 (1855)). Indeed, the abuse of warrants was one of the primary causes of the colonies' revolt against the crown and of the development of

search and seizure provisions in colonial constitutions predating the federal constitution. *Savva*, 159 Vt. at 85, 616 A.2d at 779–80. Administrative searches, such as those authorized by statutes that concern regulated industries, are "'the 20th-century equivalent' of colonial writs of assistance . . . which were general warrants authorizing officials to search any and all residential and commercial premises . . . to enforce various trade regulations and . . . to halt the rampant smuggling of untaxed goods." *Scott*, 79 N.Y.2d at 497–98, 593 N.E.2d at 1343, 583 N.Y.S.2d at 935 (quoting *Illinois v. Krull*, 480 U.S. 340, 364 (1987) (O'Connor, J., dissenting)). Given the similarity between searches made pursuant to the English general warrants outlawed by the colonists and administrative searches made pursuant to modern-day statutory provisions, we are bound to narrowly and precisely construe such provisions so as not to subvert the basic privacy interests protected by our constitution. See *id.* By allowing police to inspect, without warrant, the prescription records of individual citizens suspected of criminal activity, the majority ignores the rationale for allowing searches of certain industries without judicial oversight — that such searches are routine, random, and limited to ensuring that highly regulated businesses comply with administrative regulations — and thereby allows law enforcement agencies to circumvent the warrant requirement that we have so conscientiously guarded in the past.

Moreover, the owners of pervasively regulated businesses are on notice of the special government interest in their affairs, and they impliedly consent, by engaging in such businesses, to the abridgement of certain rights in exchange for the right to do business at all. See *United States v. Biswell*, 406 U.S. 311, 316 (1972) (warrantless inspection scheme of Gun Control Act poses limited threat to justifiable expectation of privacy because dealer who chooses to engage in pervasively regulated business does so with understanding that his business records will be subject to inspection). This is a far cry from the individual who, afflicted with disease or injury, is prescribed a regulated drug by a physician in the course of medical treatment. That person has no choice but to have the prescription filled by a pharmacist. If the drug prescribed is one in which the police have an interest, the mere act of having that prescription filled

now permits the police to intrude on that person's private affairs by reviewing the prescription, looking for other prescriptions, and, as occurred in this case, having one's doctor or doctors questioned. Article 11 simply does not permit the statute to go that far.

Although I ground my dissent on Article 11, I believe the instant search would be improper even under the United States Supreme Court's ever-narrowing interpretations of the Fourth Amendment. In *Camara v. Municipal Court*, 387 U.S. 523 (1967), the Supreme Court held that the Fourth Amendment applies to administrative searches undertaken for regulatory purposes as well as to searches for criminal evidence, but that warrants for administrative searches need not be supported by probable cause in the traditional sense because they "are neither personal in nature nor aimed at the discovery of evidence of crime." *Id.* at 537. Soon after *Camara*, the Court created an exception to the warrant requirement for administrative searches when the particular industry is subject to close governmental supervision and an authorizing statute provides specific procedures governing the scope of the search. See *United States v. Biswell*, 406 U.S. 311 (1972) (Gun Control Act); *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970) (regulation of liquor industry).

This exception is relevant, however, *only* within the context of administrative searches, as evidenced by the United States Supreme Court's most recent pronouncement on administrative searches. See *New York v. Burger*, 482 U.S. 691 (1987). In *Burger*, the Court reversed a decision of the New York Court of Appeals that struck down a statute permitting police to conduct warrantless searches of automobile junkyards. New York's highest court had struck down the law because it authorized searches "undertaken solely to uncover evidence of criminality and not to enforce a comprehensive regulatory scheme." *People v. Burger*, 67 N.Y.2d 338, 344, 493 N.E.2d 926, 929, 502 N.Y.S.2d 702, 705 (1986). The Supreme Court held that the "discovery of evidence of crimes *in the course of* an otherwise proper [warrantless] administrative inspection [of a closely regulated industry] does not render that search illegal or the administrative scheme suspect." *New York v. Burger*, 482 U.S. at 716 (emphasis added). The Court pointed out, however, that

it was "undisputed that the inspection was made solely pursuant to the administrative scheme," and that there was "no reason to believe that the instant inspection was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws." *Id.* at 716–17 n.27.

Contrary to the majority's statement herein, motive of the officers conducting the search is a relevant consideration under *Burger.* The Court in *Burger* was concerned with a routine administrative investigation that uncovered criminal evidence, not with a criminal investigation unrelated to any administrative search. *Commonwealth v. Slaton,* 530 Pa. at 213, 608 A.2d at 8. The *Burger* holding is much more limited than the majority's holding here, which gives its blessing to an inspection whose sole purpose from the start was to gather evidence that defendant had committed a crime. It is irrelevant that defendant was charged with a criminal violation defined in the same statute that authorizes inspection of pharmacy records. The point is that defendant's medical records were targeted for discovery; they were not the incidental discovery of a lawful administrative search.

The situation here is similar to the one in *Slaton,* where the Pennsylvania Supreme Court recently upheld the suppression of evidence obtained by narcotics agents, who first inspected prescription records of a suspected individual with the consent of the pharmacist, and then returned to inspect more records after the focus of the investigation had turned to the pharmacist. According to the court, the "primary flaw" in the State's position was its characterization of the agents' action as an "administrative search," which the court labeled as an attempt "to diminish [the defendant's] expectation of privacy in the premises searched." *Id.* at 212, 608 A.2d at 7. Distinguishing the United States Supreme Court's *Burger* decision as being concerned with a routine investigation that was initially conducted to ascertain compliance with administrative regulations, the court stated:

> In the case at bar, the narcotics agents' only purpose in searching Slaton's pharmacy was to investigate alleged activity. This was true even when the first search was conducted. The agents never claimed to have any administrative purpose but instead, declared at the outset that

> their desire was to gather additional information for an ongoing criminal investigation whose subject at that time was someone other than Slaton. The search, therefore, was not an administrative inspection conducted, as the *Burger* case requires, on a regular basis, but a discretionary act by officials who were involved in an ongoing criminal investigation. Since it was never claimed that the searches were administrative, the question of the parameters of an administrative search is not relevant here. The traditional Fourth Amendment warrant requirements for a valid search, therefore, apply in this case.

*Id.* at 214, 608 A.2d at 8; see also *Frodyma*, 386 Mass. at 438–441, 436 N.E.2d at 928–29 (because entire justification for lesser showing required to obtain administrative warrant is grounded on limited scope of administrative search, such warrant cannot be used to search for evidence of a crime); *People v. Pace*, 101 A.D.2d 336, 340, 475 N.Y.S.2d 443, 446 (1984) (court concluded it need not consider whether statute allowing warrantless administrative searches had sufficiently specific guidelines to pass constitutional muster because "[w]hen a search is not undertaken as a routine regulatory inspection the administrative search rationale is simply inapplicable"). But cf. *State v. Rednor*, 203 N.J. Super. 503, 509, 497 A.2d 544, 547 (1985) (in determining constitutionality of search, court must concern itself with propriety of conduct, not motivation of searcher).

The lower federal courts have adopted conflicting positions on whether the motivation of law enforcement officers should affect the validity of an administrative search warrant. Compare *United States v. Acklen*, 690 F.2d 70, 74 (6th Cir. 1982) (validity of administrative search warrant should depend on manner and scope of search, not motivation of inspector); *United States v. Prendergast*, 585 F.2d 69, 70–71 (3d Cir. 1978) (same), with *United States v. Russo*, 517 F. Supp. 83, 84–86 (E.D. Mich. 1981) (administrative warrant cannot support search of records to gather evidence for possible prosecution); *United States v. Lawson*, 502 F. Supp. 158, 164–66 (D. Md. 1980) (once purpose of search shifts from administrative compliance to quest for criminal evidence, government must secure warrant supported by full probable cause because individual's privacy interest is heightened). The majority cites three cases

for the proposition that the intent of the police to uncover suspected criminal activity cannot taint an otherwise valid administrative search. Those cases are hardly a ringing endorsement for the majority's point of view. First, all three cases construe the Fourth Amendment, yet, as noted, this Court has repeatedly stated that it will not follow precedents that derogate the central role of the judiciary in Article Eleven jurisprudence. See, e.g., *State v. Berard*, 154 Vt. at 310, 576 A.2d at 120. In one of the cases, the court stated that it need not decide whether it would allow warrantless administrative searches pursuant to criminal investigations in situations where the government had, as an institution, committed itself to the prosecution. *Acklen*, 690 F.2d at 74. In another, an intermediate appellate state court construing the Fourth Amendment said, absent any analysis, that the motivation of police in searching a pharmacist's records was irrelevant. *State v. Rednor*, 203 N.J. Super. at 509, 497 A.2d at 547. But the gist of its holding was revealed in the sentence that followed, wherein the court concluded that the pharmacist had no expectation of privacy in the records because he had willingly engaged in a business subject to pervasive government regulation. *Id.* In the third case, *United States v. Nechy*, 827 F.2d 1161, 1166–67 (7th Cir. 1987), the court lamented the fact that it was compelled to allow law enforcement to use administrative search warrants as a subterfuge for investigating suspected criminal activity. *Id.* at 1166 ("We are not happy with a mode of justification by which the government is allowed to do in two steps what if done in one would violate the Fourth Amendment.").

State courts that have recently addressed the same issue, however, have not felt so constrained. In addition to the Massachusetts and Pennsylvania cases already cited, the highest courts of New York and Ohio have recently held that law enforcement authorities must obtain a warrant based on probable cause before searching regulated enterprises as part of an ongoing criminal investigation, even where statutory law permits administrative searches of the enterprises. Despite the Supreme Court's relatively limited holding in *Burger*, the New York Court of Appeals recently rejected that analysis and determined that the same statute it had earlier struck down under the Fourth Amendment also violated the state constitutional

provision prohibiting unreasonable governmental searches. *Scott*, 79 N.Y.2d at 491–92, 593 N.E.2d at 1339, 583 N.Y.S.2d at 931. The court grounded its holding on the "fundamental assumption" that an administrative-search exception cannot be invoked when the search is undertaken to uncover evidence of a crime, and the underlying regulatory scheme is designed to give police a means of enforcing criminal sanctions. *Id.* at 497, 593 N.E.2d at 1343, 583 N.Y.S.2d at 935; see also *Burger*, 482 U.S. at 724 (Brennan, J., dissenting) ("In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations."). According to the court, without this limitation, the exception would swallow the rule and permit police to circumvent traditional warrant requirements. *Scott*, 79 N.Y.2d at 497, 593 N.E.2d at 1343, 583 N.Y.S.2d at 935.

The Supreme Court of Ohio has also recently held that the search and seizure provision of the state constitution prohibits police from searching for criminal evidence pursuant to a statute authorizing warrantless "administrative" searches. *State v. Penn*, 61 Ohio St. 3d 720, 723, 576 N.E.2d 790, 792–93 (1991). In that case, police and agents of the state board of pharmacy inspected the prescription records of a pharmacy after the police had already begun a criminal investigation of the pharmacist. Calling the State's attempt to "shelter itself" behind the administrative powers of the board "disingenuous," the court stated that "the board cannot act as a surrogate for the police to obviate the constitutional duty of obtaining a search warrant" before gathering evidence of general criminality. *Id.* at 726, 576 N.E.2d at 794.

I recognize that it will not always be easy, as it is in this case, to determine whether a search is truly administrative in character or merely an attempt to uncover evidence of a crime. But this difficulty does not permit us to abdicate our duty to protect the citizens of this state from unconstitutional searches. If we are to allow law enforcement officials to inspect personal records, without judicial oversight, pursuant to an exception that permits routine administrative searches, we cannot then shrug our shoulders in helplessness while police exploit that exception by using it to gather evidence on individuals suspected of crimi-

nal activity. Suspicion on the part of the police should not invalidate an otherwise valid administrative exception, but when police have specific information that triggers a search made solely for the purpose of gathering criminal evidence against an individual, a warrant based on probable cause is required. *People v. Brigante*, 131 Misc. 2d 708, 715, 501 N.Y.S.2d 583, 588 (Sup. Ct. 1986) (the litmus test for determining whether inspection is valid administrative search is whether *purpose* of search was to gather evidence of a crime, not whether the police had suspicions of criminal activity).

Our constitution requires a warrant when the government seeks to uncover evidence of criminal activity. Cf. *State v. Dorn*, 145 Vt. 606, 616–17, 496 A.2d 451, 457 (1985) (assuming, without deciding, that seizure of prescription records from barn of pharmacy owner suspected of welfare fraud required a warrant based on full probable cause). We cannot allow police to circumvent our steadfast stricture against warrantless searches by wearing the masks of administrative officials while pursuing criminal investigations. Because the instant search violated Article 11, evidence gathered from it must be suppressed. Further, because the search of the pharmacy was unlawful, and the police uncovered evidence during that search that led them to contact and interview defendant's prescribers, I believe that the evidence obtained by police in conversations with those prescribers was tainted and, therefore, must also be suppressed. See *State v. Badger*, 141 Vt. 430, 439–41, 450 A.2d 336, 342–43 (1982) (illegality of first confession tainted second confession).

There is one other point about the majority's opinion that deserves mention. Even if the search of defendant's pharmaceutical records had been lawful, I disagree with the majority's conclusion that admission of the statements police obtained from defendant's physicians was harmless error. The majority agrees that the court's reasoning for allowing admission of the statements — that the statements were nonprivileged because they were found to be made in an attempt to obtain illegal drugs — is flawed because it allows the State to declare a communication nonprivileged *after* the doctor-patient confidentiality has been breached. Nevertheless, the majority upholds the court's ruling, stating that admission of the evidence was harmless because the police sought only to find out

from the prescribers whether they would have prescribed the medication if they had known of other concurrent prescriptions.

I do not understand the majority's reasoning. The patient's privilege is very broad. Our law prohibits physicians from disclosing "any information acquired in attending a patient in a professional capacity, and which was necessary to enable the provider to act in that capacity." See *State v. Raymond*, 139 Vt. 464, 470–71, 431 A.2d 453, 457 (1981) (privilege prevented nurse from testifying that the defendant had alcohol on his breath); see also V.R.E. 503(b) (privileged information includes "confidential communications made for the purpose of diagnosis or treatment of [the patient's] physical, mental, dental, or emotional condition"). Certainly the information disclosed in this case meets these definitions, and the majority does not argue otherwise.

Once we conclude the communication is privileged, we cannot call it harmless unless "'it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error.'" *State v. Wright*, 154 Vt. 512, 519–20, 581 A.2d 720, 725 (1989) (quoting *State v. Hamlin*, 146 Vt. 97, 106, 499 A.2d 45, 52 (1985)). That is hardly the situation here. The doctors' statements that they were unaware of other prescriptions, and that they would not have prescribed the medication if they had known of the other prescriptions, constituted the principal element of the charged crime — obtaining a regulated drug by concealment of a known fact. See 18 V.S.A. § 4223(a)(3). The issue cannot be dismissed in summary fashion merely by concluding that the evidence is harmless.

Accordingly, I dissent not only from the majority's conclusion that the warrantless search of defendant's prescription records was lawful, but also from the conclusion that admission of statements made to police by defendant's doctors was harmless error.

I am authorized to say that Justice Morse joins in this dissent.